PROVOSTS', C. J.
The father and mother of defendant are relators in this habeas corpus proceeding, the object of which is to recover possession of defendant’s 8- year old son. They allege that the child was given to them permanently by defendant in infancy, and that he has remained with them ever since; < that 13 days before the filing of this suit defendant secured possession of the child on the pretense of desiring to buy him *219 some clothes; that defendant and the mother of the child have been divorced, and that defendant recently remarried, and is not in a position to give the child proper care.
Two days after the case had been closed and taken under advisement the relators filed the following motion:
“Now into court come Mrs. Maggie Shutt and Gus Shutt, relators herein, and move and pray the court to reopen this case for further evidence.
“They show that, since the trial hereof, the names of material and important witnesses have been ascertained, who will swear that respondent lived in open adultery with his alleged present wife prior to his purported divorce from his former wife and illegal second marriage; that such conduct of respondent and the woman with whom he is now living, to w.hom he is not married, is and was a matter of common knowledge in the city of Shreveport, which conduct renders respondent totally unfit to have the custody, care and control of his minor son, William Shutt, Jr.
“Wherefore they pray that this motion be sustained, that accordingly the case be reopened, and, after due proceedings had, for judgment as originally prayed for.”
Along with this motion the relators filed another motion, asking to be allowed to withdraw the allegation made in their petition that defendant was divorced from the mother of the child, as having been made “inadvertently and erroneously,” and pleading the nullity of said divorce for want of citation.
Over the protest of defendant, the court allowed these motions to be filed, and fixed the case for trial.
On September 27, 1920, two days before the day fixed for the trial, the relators filed an amended petition renewing the allegations contained in the said two motions.
Defendant objected to these new pleadings upon every conceivable grbund; but in vain. He then filed his answer to the supplemental petition, and at the same time filed the following motion for a continuance:
“Now into court through his undersigned counsel comes W. J. Shutt, defendant in the above-entitled and numbered suit, and respectfully shows that he is unable to go to trial thereon at this time, and he asks for a continuance of the same, for the following reasons :
“He shows that, in order to accomplish their purpose, the relators .have assailed his moral character, have charged him with the gravest, or one of the gravest, moral crimes that can be committed, have cast moral obliquity upon-him and his wife, by the charge that ,he and his said wife lived in open adultery before their recent marriage.
“That these charges of the said relators are of such a grievous nature, and in the manner in which they were brought make his said wife a party to this suit, whether she has been done so by direct pleadings or not. 'That, at any rate, these charges make his said wife an-important and material witness for him, respondent, as well as herself, in his defense. That she is now seriously ill, threatened with, if her case has not already been declared and' pronounced, typhoid fever, which makes it impossible for her to appear in court and testify in the case. That by her as a witness he expects to refute the slanderous charge of adultery made against him, and his said wife. That he-cannot prove the very facts by any other-witness. That the said witness has been duly summoned according to law, and in all respects the law of summons has been complied with, and that she is within the jurisdiction of' this court.
“He shows that, without the testimony of this witness, his said -wife, he not only cannot obtain a fair trial; his case cannot be properly-presented to the court, and common justice cannot be secured; cannot be obtained in fact; that his very rights, .his superior rights that are his in both morals and the law, will be trampled on without the testimony of this-witness, and a great and cruel and outrageous wrong will be perpetrated; and he asks for a continuance until such a time as the said witness can be brought into court to testify.
“Wherefore respondent mover prays that .his-motion for a continuance be granted, and this-case be continued till such time as the said witness is able to appear in court to give her testimony so vital to this respondent, the cause of justice, and to herself.
Counsel for relators admitted that the-defendant’s wife, if present, “would refuse the immoral charges imputed to respondent as set up in the motion for a continuance”;, and thereupon the court denied the motion. *221 for a continuance, and ordered the trial to' I be proceeded with. To this ruling defendant duly excepted.
The word “refuse” should, we assume, he refute.
This malting of a new departure by relators was very evidently for mending their hold, they realizing that they had failed to make out a case.
The alleged inability of defendant to take proper care of the child had not been even attempted to be shown, and his alleged agreement to give up the child permanently had been denied positively by him, and testified to only by the grandmother, and, even then only in a more or less argumentative way, and would not have been good ground even if positively established, since the parental authority cannot be bargained away. With reference to the custody and care of the child theretofore, the evidence showed that the mother of the child was an invalid, living for -a while next door to the grandparents, and that whenever she, in her spells of illness, was unable to take care of the child, the child would be taken care of by the grandparents, and that this happened at intervals until the child was about 4 years old, when, the condition of the mother becoming more or less chronic, the child remained with the grandparents and their grown daughter continuously until defendant, as alleged, took possession of him a few days before the filing of this suit.
The law of the case may be stated to be as follows: „
“Art. 216. A child remains under the authority of his father and mother until .his majority or emancipation.
“In case of difference between the parents, the authority of the father prevails.”
“Art. 2327. Neither can husband and wife derogate by their matrimonial agreement from the rights resulting from the power of the husband over the person of his wife and children, or which belong to the husband as the head of the family.”
“Mather entitled to custody of children, even though she left child in care of paternal grandmother for several years, and child shows more affection for latter than mother. State ex rel. Kearney v. Steel et al., 121 La. 215.”
“The father is the master of. the family. His authority as to its civil force is founded on nature, and the care which it is presumed he will have for their education. While his conduct is proper the court cannot interfere with his authority,” etc. State ex rel. Lasserre v. Michel et al., 105 La. 745, 30 South. 124, 54 L. R. A. 927.
“Eor depriving a father of the tutorship of his children, a strong case should be made out.” In re Alexander, 127 La. 854, 54 South. 125.
“In cases of separation from bed and board the children should be placed under the care of the party obtaining the separation, but the judge may, for the greater advantage of the children, and with the advice of the family meeting, order that some of them or all of them shall be intrusted to the other party. There is no such discretion in cases of divorce.” Crochet v. Dugas, 126 La. 286, 52 South. 495.
“The father of minor children is entitled to their custody, as against the father and sister of his deceased wife, unless it appears that he will neglect them, or expose them to improper influences, in which case they will be given into the custody of others.” Ex parte Lincoln, 128 La. 278, 54 South. 818.
“The right to the care, custody, and control of a child being granted ,by law to the father, the court will uphold his authority, unless it is proved that the father is disqualified by unfitness to have such care, custody, and control of his minor child.” Heitkamp v. Ragan et al., 142 La. 81, 76 South. 247.
In dealing with the case as developed on the new pleadings and second trial, we shall leave out of consideration altogether the alleged nullity of the divorce of defendant, being satisfied that this alleged nullity can have no influence upon the fitness of defendant’s home for receiving the boy, or upon the future welfare of the boy if left in the paternal care where he legally belongs. The divorce was obtained in perfect good faith, and in perfect good faith the defendant has remarried (as likewise has his divorced wife, we are informed at the bar). *223 The social position of defendant and his wife is good, unless the present resurrection and ventilation of a huried scandal has afr fected it, of which we have no proof.
The relators allege in their motion— and they do it under oath — that the alleged adultery of defendant with his present wife, was matter of common knowledge in the city; and yet they admit in their testimony that defendant’s, present wife has been a guest at their home after the relations of their son with her, which they now so sincerely condemn, had begun, and although the ground assigned by them for asking that the case be reopened was that “since the trial hereof the names of material and important witnesses have been ascertained, who will swear that respondent lived in open adultery with his present wife.”
Now, who are these witnesses. In 1918, two years before the trial of this suit, defendant’s wife, then Mrs. Brown, lived on Texas avenue, with her. husband and her 10 year old boy. Next door to her — the two houses touching — lived two spinster dressmakers, sisters, who, it seems, were scandalized at what they could see going on next door, and complained to the sheriff. One of them testifies that defendant would be there “all day long”; then that what attracted her attention was that he came there “often,” and would come “at any time,” and would stay “two or three hours; sometimes not quite that long”; that he would not rap at the front door, but just open it and walk in; that her reason for reporting to the sheriff was that she was afraid “that there might be murder if Mr. Brown walked in. Q. Was Mr. Brown there during the day? A. No, sir; sometimes he was and sometimes • he was not. Q. Well, was he there as often as he was absent when Mr. Shutt would come? A. No, sir. Q. Did Mr. Brown ever appear upon the scene at any time when Mr. Shutt was there — come in on him? A. Yes, sir. Q. You do not know what happened. A. No, sir.”
The sister testified to the same thing, in about the same words.
They admit that after their complaint to the sheriff things went on as before until Mr. and Mrs. Brown moved away, their house having been partially destroyed by fire.
The sheriff made no investigation, but saw defendant, and told him that “I would like him to cut it out, and he assured me that there was nothing to it, and he told me something about this woman working for the White Pressing Club, and I told him that I hoped there was not, but that it looked very suspicious, and I would rather he would cut it out, and I went; to see his father about it.”
The inside story is that defendant attended to the outside work of the White Pressing Club, a concern doing quite a large business, judging from the number of employes; that in the summer of '1918 Mrs. Brown was employed at the establishment to do “the facing, darning, and relining of coats and dresses,” and that later on she did this work at her home, and that defendant carried the work back and forth, and that he used an automobile wagon, and that this wagon would necessarily station in front of Mrs. Brown’s house when he was inside; that this would happen several times every day. Beyond his thus going into the house,- not a suspicious circumstance is mentioned! He and the husband were good friends, and continued so to the end. The husband drove an ice wagon, and would be at home at all hours of the day.
All this proves absolutely nothing against defendant. But many circumstances are detailed in the evidence which would go to show that he and Mrs. Brown had even at that time become very good friends;' and, in the light of. the subsequent marriage, it *225 can be seen that the relation became, if it was not at first, something more than friendship. When he fell seriously ill at his father’s house, she came to nurse him. When she fell sick he took her to the sanitarium in his automobile wagon, and while she was there he several times visited the sanitarium to make inquiry. He spent at the Brown house (under guise of friendship for the husband, we must assume) much time that should have been devoted to his own home on Prospect street. This led to remonstrances by his parents and his sister, which he answered by assurance that there was nothing wrong. On one occasion he retorted to his sister that Mrs., Brown was as good as she, which brought on the first discord in the family. The sister took offense, and demanded an apology, which a brother, more muscular than defendant, enforced. Exactly what the nature of the apology was is not clear. The sister was asked:
“Q. I am putting myself in his place, when he apologized, did he say ‘Sister she is not a good woman?’ A. No, sir; says, ‘Sister, I am sorry for what I said to you; I-made a mistake.’ Q. He never admitted that she was not a good woman? A. No, sir.”
Pages upon pages of testimony are taken up in the record'for showing that there was ¿ better chance of getting defendant on the phone at the Browns than at his own home, and that even the child now in contest knew this. This shows that defendant found thé house of the Browns more attractive than his own, and that he had the weakness to yield to this attraction, but falls far short of forfeiting for him the right to have his child.
Defendant obtained a judgment in separation from his first wife in May, 1918. Whether it was before this or later on that his visits-to the Brown house began is not made clear by the evidence. One of the spinster sisters, dressmakers, says that these visits were going on three years before the trial, which would place them in 1917. But the other sister says that it was not so long ago as this; that her sister was “just a little mistaken on the time.”
We may mention here that Mrs. Brown and these sisters were friendly neighbors until Mrs. Brown’s boy began “to do things about the place, and she would not correct him. He would pull the pickets off and let the chickens out; and we did not speak to her- after that.” So testifies one of the sisters. Defendant is positive that it was in .the summer of 1918 that Mrs. Brown became an employs in the White Pressing Club, and that her work was at the establishment for several months before it began to be done at her house. We gather, therefore, that" his carrying clothes to and from her house for mending and after mended began after he had obtained his judgment in separation from bed and' board.
In August, 1918, his first wife returned to her parents in Mississippi. It is said that he sent her ayvay; but nothing shows that she was not willing to go. Certain it is that their further living together had become insupportable. For showing this in the separation from bed and board suit, defendant’s father was one of the witnesses. He now says that he did. not then know that for this intolerable situation defendant was to blame. But in that statement he must be mistaken, since the trouble between the spouses had been of long standing when defendant, either after or shortly before the judgment in the separation suit, began the visits to the Brown home. While it is shown that defendant’s absence from his home after night would cause distress to his wife, so that on one" or more occasions she, being afraid to stay alone in her own house,, took refuge to the house of Mr. Zaget, a neighbor, it is not shown, and it does not necessarily follow that these absences were caused by Mrs. Brown, or did not antedate his acquaintance with her.
*227 The suit in separation from bed and board was based on cruel treatment and defamation. In June, 1919, the judgment in it was followed by a judgment of final divorce, on showing made that no reconciliation had taken place between the parties. In this judgment of divorce the custody of the children was adjudged to defendant. They were the boy in question, then 6 years old, and a girl of 4, whom the wife had taken to Mississippi with her, and whom defendant has allowed her to retain.
The Browns moved away from the house next door to that of the two censorious lady dressmakers some 3 or 4 months after these ladies had made their complaint to the sheriff. She went to her mother’s, and then, as we understand, lived for a while on Wyndott street, and then, on January 16, 1919, went to live in the house on Prospect street belonging to defendant, in which defendant and his first wife had lived. This house consisted of a sleeping porch, a kitchen, and a sleeping room. In. February, 1919, three rooms were added to it. Defendant came to live in this house with Mrs. Brown, who then had become a divorcee or a widow— the record does not show which. He says that he came there in August, 1919, to board, after a quarrel with his brother, which caused him to leave his father’s house where he had been staying. Whether this testimony of his is true or not, and whether he did not come to occupy the house with Mrs. Brown as soon as she moved into it, is left somewhat doubtful by the testimony as a whole. He was seen at this house early in the morning and late at night, but his delivery wagon was kept there at night, and this may to some extent account for his presence there early and late. The carpenter who constructed the additions in February, 1919, says that he (the carpenter) would be at his work at 7:45 in the morning; but could not? tell whether; any one but.Mrs. Brown and her son had spent the night there. This son, then 11 years old, slept with his mother. He testified in the case, being at the time of the trial 12 years old, and showed by his testimony rather remarkable mental development. After testifying in chief that he did not “just remember” whether it was before or after the additions had been made to the house that defendant came to live there, he testified on cross-examination as follows:
“Q. After you moved over there how' long did you and your mother stay there before Mr. Shutt moved over? A. I do not know, sir. Q. Pretty soon, was it not? A. Was not so soon after that. Q. Was not more than a month or so? A. I guess it was a month and a half. Q. He came pretty soon? A. Was not so soon; a month is 7pretty long to me. Q. Then he moved over within a month after that, with you and your mother? A. I do not remember; I cannot say. Q. When he moved over there, there was just two rooms to the house, one bedroom, kitchen, and sleeping porch? A. Yes, sir. Q. You had to go through the bedroom to get to the sleeping porch? A. Yes, sir. Q. You answered Mr. Hicks that you slept with your mother; now who slept on the sleeping porch; Mr. Shutt? A. Yes, sir; at that time. Q. Was he there every night? Did Mr. Shutt stay there every night? A. Yes, sir.”
This would lead us to believe that defendant occupied the bouse with Mrs. Brown even before the additions were made. After the additions were made, Mrs. Greetr and her 5 year' old child were boarders there, and the presence of defendant there as a boarder would be less suspicious. Be all this as it may, there is the positive testimony of defendant that there was nothing wrong between him and Mrs. Brown, and there is the indignant protest of Mrs. Brown to the same effect, as contained in the motion for a continuance, the contents of which motion the relators admitted she would testify to if present. The boy saw nothing wrong. The nearest neighbor, a Mr. Rembert, had no suspicion of anything *229 wrong, nor his wife, for she called in Mrs. Brown tó nnrse her on one occasion, and would give her work as a seamstress. The carpenter who made the additions suspected nothing wrong.
Against this there is the testimony of a Mr. Zaget, whose' house lot, fronting on Robinson street, adjoins at the back the lot on which is the house in question facing Prospect street. He testified as follows:
“Q. You observed his conduct while his wife, Mrs. Minnie Shutt, lived there, and you observed his conduct after she went away, and' Mrs. Brown went there; did he remain at home more or less after Mrs. Carrie Brown moved there? A. He got home earlier since the other arrangement than he did before. Q. Has he stayed at home more since Mrs. Brown has been there? A. Yes; I believe he has. Q. Stayed there at night? A. 1 do not know about that. Q. Would you see him leave there in the morning? A. Yes, sir. Q. How early would he leave there in the morning? A. Well, I do not know exactly; see him leaving at 7 or 8 o’clock. Q. Would you see him go in in the morning, before he left? A. I cannot say that I did. Q. The first thing that you would observe about him in the morning would be his leaving the place to go to work? A. Yes, sir. Q. About what time would he return to the place in the evening? A. Well, I do not know just exactly; generally before dark. Q. Would he go there for lunch during the day? A. Yes, sir; come in at lunch time. Q. Was he there about as often as you see a man at home — a business man in Shreveport? A. Yes, sir; I think so.”
And on cross-examination:
“Q. When you used the words a little while ago ‘they lived together,’ you did not mean to say that-Mr. Shutt and this woman occupied the same room? A. I did not say that. Q. You did not mean to answer that? A. No, sir. Q. You did not mean to infer that? A. I did not infer anything. Q. You did not mean to suggest that they occupied the same room? A. No, sir. Q. You meant that they lived in the same house? A. Yes, sir; lived in the same house. Q. You know, when you would see that truck go in, what, direction he would come there? A. Have to come in a little alley off of Line avenue. Q. Now you do- not know whether he came from his mother’s house to get that truck in the morning or not — you never saw him come out of the house? A. Yes, sir; saw him come out of the house. Q. Did he come out of the house to get the truck? A. I do not know about that. Q. Now, then, would you see him when he would come in with the truck? A. Yes, sir. Q. What attracted your attention to his coming in? A. I hardly know how to answer that. Q. Now, then, when he would come in and leave the truck, would he always go in the house, or would you knoW where he went, in the evening? A. No; I do not know where he went; he went there like he belonged there — his own pla'ce; I suppose he did. Q. AVould he always go in the house when he brought the truck in in the evening? A. I did not say that he always went in, I never saw him go away,, though."”
Mr. .Weldon, the corner grocery man, whose lot fronting on another street “cater-cornered at the back” with, that on Prospect street, testified as follows:
“Q. At the time that she moved in, who was living there? A. Well, I do not know; I do not know any one else was living there at the time. Q. When she moved there, who lived there with her? A. Well, it gradually dawned on my mind that Mr. Shutt was staying there. I did mot know' whether he was living with her or she was living with him; never did find out exactly which it was. Q. How often did you have occasion to observe this place and the movements of Mr. Shutt and Mrs. Brown? A. Well, in coming from my home to my work I would go across the lots and pass by their house, and I passed there four times a day. in the morning, aboiit 6:30 I would pass there; then again about 1 o’clock; and then again about 8, 9, or 10 o’clock at night. Q. During these times when you would pass there did you have occasion to observe this place, and who did you see there? A. Well, I usually, in the daytime, would see most all of them; Mr. Shutt part of the time would be in and out, though there was a period of time, I do not know how long, he was doing repair work, and he was there principally all the time, as far as I knew; would see him in passing back and forth. Q. See Mrs. Carrie Brown there all the time? A. Well, could not say I saw her all the time; saw .her there at times. Q. She was living there? A. Yes, sir. Q. Was W. J. Shutt living there, too? A. I always took it for granted j;hat he was. Q. Did you ever see him there at night? A. Well, yes; I have seen him there at night. Q. Seen him leaving there in t.he morning? A. Yes, sir. Q. What was *231 the first time — how early in the morning did you have occasion to pass there and see any one? A. I usually passed there at 6:30; I did not usually see Mr. Shutt when I would pass in the morning, but ordinarily I saw his car there; then a little while afterwards he would pass the store in the car going to work. * * * Q. He drove a laundry car? A. Yes, sir; White Gleaning & Pressing Company wagon. Q. That is the wagon that I am referring to; now how often did you see that car there; at any and all times? A. Well I usually saw that car there at night and mornings, and at noon when he come to dinner. * * * Q. Prom what you saw in passing there, as you have testified, and from the size of the house, and from the frequency of seeing the car in front, knowing they two were there in the house, did you think that they were married or not? A. No; I did not think they were married, because I had occasion to know they were not. Q. You had occasion to know that they were not? A. Yes, sir. Q. Without that knowledge, which you had occasion to ascertain from general appearance, what would have been your conclusion that they were a family or not? A. I think that I had several parties to ask me if they were married; that shows what other people thought. I did not draw any conclusion. Q. Mr. Weldon, was there not a good deal of complaint there about their living in that house, Mrs. Brown and Mr. Shutt, by the neighbors? A. I never heard of it. * * * Q. Mr. Weldon, when you would see them together, would you see anything wrong in their conduct? A. No, sir; not a thing in the world; looked like home folks' Q. Ever in their place, the home? A. Yes, sir. Q. Ever see any undue familiarity? A. No, sir. Q. Mrs. Brown introduced herself to you as Mrs. Brown? A. Yes, sir; as Mrs. Brown. Q. She traded with you? A. Yes, sir. Q. Who paid the bill? A. She paid what she got.”
Mr. Efner, a neighbor in the same block on Prospect avenue, testified:
“Q. How often did you see Mr. Shutt there? A. Seen him tliefe pretty frequently; often. Q. Was he staying there at that place as his home? A. Yes, sir; I imagined that he was. Q. Was Mrs. Brown living there at that place as her home? A. Would see her coming and going, and her son coming and going; supposed that the son stayed there with his mother. Q. See thém -together, coming and going, Mr. Shutt and Mrs. Brown? A. Yes, sir; all three of them coming and going. Q. When Mrs. Brown moved in there, did you know whether or not they were married? A. No. sir; I did not know; they told me they were getting a divorce, and I imagined he had gotten a divorce. Q. You thought that they were married? A. Yes, sir. Q. All the time they were living there together, were you under the impression that they were married? A. Yes, sir; learned last Sunday when talking to him that they were not married then. Q. Was that the first time that you learned that they were not married? A. Yes, sir; Mr. Shutt spoke to my wife, I think Saturday, and said they, were not married — old man Shutt. Q. You answered that you thought that they were married? A. Yes, sir. Q. Will you tell us what you based that on; living next door to them? A. Yes, sir; and their coming together and from passing along the street. Q. And living in the house, too? A. Yes, sir; I think that I seen him most of the time mornings and evenings; places close together and seen him pretty regularly. Q. You have had inquiries made to you by people in the neighborhood as to whether they were married or not; was the matter discussed? A. No, sir.”
Besides this we have the testimony of the father, mother, sister, and brother. So wrought upon by their feelings, however, are these relatives that we have to take their testimony cum grano. The impression derived from it as a whole is that they have striven to make retrospectively mountains out of mole hills. The mother says:
“I would not live long if I did not get the child; would grieve myself to death; lost ten pounds since W. J. took him; that is the way I feel about it.”
The father testifies that he believes this would happen to his wife. And the daughter announces her firm intention never to marry, but to devote her life to the child. The brother confesses his enmity. And there is the evident bitterness now existing which impels these people to cast aspersions upon their own son and brother, and .throw doubt upon the validity of his present marriage, and becloud the legitimacy of any issue of that marriage, and incidentally render the same services to defendant’s ex-wife and any issue of her present marriage, thus *233 trampling every consideration under foot in a mad endeavor to get possession of this child to whom the old folk and the sister have become strongly attached.
Even, however, taking their testimony as it is, there is very little to it in the nature of substantial fact.
The only statement contained in it really needing notice is that of the mother, to the effect that, on the occasion when defendant was sick at her house, and Mrs. Brown came to nurse him, Mrs. Brown made the remark: “Will and Minnie are not happy, but things will be different when I get him in hand.” She was asked how long Mrs. Brown remained there on that occasion and answered: “Her and her husband stayed an hour and a half.” So that whatever remark was made by Mrs. Brown was in the presence of her husband, and of defendant’s mother, and therefore is not likely to have been anything very much out of the way.
The rest of their testimony may be said to be deductions of their own from the facts already stated in this opinion. As throwing light upon the value of these deductions, we may call attention to the statement made by the relators for obtaining a reopening of the case, that “since the trial hereof the names of material and important witnesses have been ascertained, who will swear that respondent lived in open adultery with his’ alleged present wife.”
So that all this they have now sought to bring out against their son would appear to be in the nature of newly discovered evidence.
The testimony of the said “material and important” witnesses we have reviewed hereinabove. The worst that it shows, if it can be said to show even that much, is that defendant became infatuated with Mrs. Brown, she possibly reciprocating the feeling, while both were married to other persons, and that, after she no longer had a husband, and he a wife, they lived together in this little house for a few months before their marriage, he ostensibly a boarder; the intelligent 11 year boy living with them seeing nothing wrong, and the nearest neighbor suspecting nothing wrong.
If we make allowances for the enmity which the conduct of her boy and her chickens engendered in the bosoms of her two lady neighbors, and for the mortal offense which she has done to the relatives of defendant by marrying him, Mrs. Brown, now Mrs. Shutt, would appear to be an industrious and capable woman, who has not been as careful of appearances as she might or ought to have been, but in whose affection for defendant is a guaranty that his home will be just such a one as this boy can be safely confided to.
However appealing to the court may be the affection of the relators and their daughter to this boy, and however distressing it may be to deny him to them, the rights of the father, being paramount, must be recognized. The remedy for the unfortunate situation must be found in a complete reconciliation ' of the parties, so that neither may have the child to the exclusion of the other, but all have him in common. He belongs to neither and belongs to both. Nothing in this record shows that defendant will not let the grandparents have the child to their hearts’ content, once his authority and rights are recognized and uneontested.
The judgment appealed from is therefore set aside, and the suit of relators is dismissed, at their cost in both courts.
O’NIEBB, J., concurs in the result.
BAKER and BAND, JJ„ dissent. •