HIGGINS, Justice.
 

 The mother, as surviving parent, instituted this habeas corpus proceeding against the paternal grandmother and aunt, to recover the custody of her eleven year old daughter, whom she had intrusted to them.
 

 The defense is that the mother’s men.tal condition is so impaired that the physical and mental welfare of the child would be endangered and jeopardized, if she were returned to her mother’s custody.
 

 The case was tried before a judge ad hoc, who, in substance, concluded that while relator was mentally deranged, the evidence was not sufficient to convince him that the mother was incapable of properly caring for and rearing her daughter, and awarded the child to her.
 

 Respondents filed a motion for a suspensive appeal, which was granted.
 

 Relator was married on October 9, 1923, and the sole issue of the union was the little girl in controversy, who was born on November 27, 1924. The family resided at Port Arthur, Tex. About five months after the birth of her child, the mother lost her mind completely. She was taken to the home of her parents, where the doctors advised an operation for female disorders. Subsequently, she was placed in the Louisiana Retreat in New Orleans, under the care of a psychiatrist, and treated for mental and nervous conditions for a period of about six months. She was then taken to the home of her parents, where she remained for approximately three months, after which her husband took her to their home in Port Arthur. About two months thereafter, the child was returned by the respondents, who had the care of her during her mother’s illness. Relator continued to be a nervous and eccentric person, doing a number of peculiar things, which indicated that she was not normal mentally. The family lived at Port Arthur under these circumstances until September 25, 1932, when • the husband was accidentally killed. The mother continued to remain in Texas for about eight months, and then moved to the home of her parents at. Grand Coteau, La. After she was there awhile, there was a violent disagreement between her and her parents and her brother about the child, resulting in the relator becoming hysterical and the child receiving a severe spanking by the brother. Relator took refuge in the home of her aunt, where she was confined to bed under medical treatment. During July, 1933, she followed the advice of her parents and placed the child with respondents.
 

 The present suit was instituted on January 13, 1934. The record shows that at the time of her husband’s death there was due the mother and the child $7,200 compensation, which was to be equally divided, under the laws of Texas. Due to the mother’s mental condition, a bank at Port Arthur was appointed as trustee of the funds, from which the mother and child each received regularly $40 per month. It also appears that there was certain life
 
 *407
 
 insurance, the amount of which is not stated in the record.
 

 There were three doctors who testified in the case, two in behalf of relator and one for the respondents. All of the physicians, none of whom specialize in mental diseases, agree that relator is suffering from a serious mental or nervous disorder, due either to a toxic condition resulting from childbirth and “phobia,” i. e., fear of being separated from her child, or a congenital weakness (nervousness) characteristic of her family, which causes her to have uncontrollable impulses. None of the doctors, however, would say that she was insane. The two doctors who testified in behalf of relator express the opinion that she was competent to take care of her own child in her own home.
 

 The lay witness for the relator testified that she had established a home by herself in a neighborhood close to a parochial school, and that she maintained it with excellent care.
 

 Several lay witnesses testified in behalf of the respondents as to the peculiar and eccentric conduct on the part of relator, all of which indicates that she was not normal mentally. There is convincing testimony that she stated that she would destroy the child, in the event she thought she was about to lose her own life; that she also asked for assistance for the purpose of killing her husband; and that she suffered from illusions that some one' might poison her and refused to eat food or drink coffee that was offered to her. The family physician, who observed her and attended her child for several years, while they lived in Port Arthur, expressed the view that it was neither to the physical nor mental welfare of the child to-leave it with its mother.
 

 There is no dispute as to the law governing the case. It is conceded that the mother has a superior right to the custody of her child over the grandmother and aunt. State ex rel. Sevier v. Sevier, 141 La. 60, 74 So. 630; State ex rel. Harper v. Tebault, 147 La. 889, 86 So. 320; State ex rel. Shutt v. Shutt, 152 La. 218, 92 So. 865; State ex rel. Martin v. Talbot, 161 La. 192, 108 So. 411; State ex rel. Burleigh v. Savoie, 176 La. 115, 145 So. 285. It is also conceded that the mother's right must yield to the superior right of the state to deprive her of the care and possession of her child, in the event the physical, mental, and moral welfare of the child requires it. State ex rel. Dartez et al. v. Dartez, 154 La. 722, 98 So. 164; State ex rel. Peter v. Stanga, 161 La. 978, 109 So. 783; State ex rel. Stockstill v. Spiers, 170 La. 454, 128 So. 275; Davis v. Willis, 169 La. 13, 124 So. 129.
 

 The only question presented- is one of fact, i. e., whether or not the mother’s mental condition is such that it would be detrimental to the mental and physical well-being of the child to permit her to live with her mother.
 

 The doctors agree that a person who is suffering from .serious mental and nervous disorder will conceal the things they love for fear of losing them and sometimes, if the fear is very great, will de
 
 *409
 
 stroy the object of their affection for the purpose of preventing it from being taken from them. The medical testimony convinces us that if this little girl, who is highly nervous, and, according to the doctors, who testified in behalf of the mother, susceptible to the same nervous condition that her mother suffers from, were permitted to remain in an environment created by an unbalanced mind, she would become neurotic.
 

 On the other hand, the child, since July, 1933, has received the best of care and attention from the respondents, with whom she is happily and contentedly living.
 

 After carefully reviewing the record, we are constrained to differ with the learned judge ad hoc and the two doctors in their view that the mother is capable of caring for her little daughter. It is our opinion that the physical and mental welfare of the child requires us to deny the mother’s plea. A judgment involving the custody of a child is always revocable where conditions warrant its modification. It may be that the All-Wise and merciful Divine Providence may lay a healing hand upon this unfortunate mother and restore her to such a normal condition that the court- can with confidence intrust the welfare and well-being of the child to her. Without the responsibility and worry incidental to the rearing of the child she may devote her time exclusively to hastening such a happy conclusion 'and thereby solve her own difficulty. In the meantime, we are satisfied that' the respondents will extend to her every consideration in letting her visit the child.
 

 For the reasons assigned, it is ordered, adjudged, and decreed that the judgment appealed from is annulled, and it is now ordered, adjudged, and decreed that the writ of habeas corpus issued herein is recalled and vacated and plaintiff’s suit dismissed.