HAMITER, Justice.
 

 In this habeas corpus proceeding Mamie Lucille Munson, a resident of Chicago, Illinois, is seeking to regain the custody of her illegitimate daughter, Dolores Holden, now under the care, supervision and control of Alma Jackson of Franklin, Louisiana, and Hudson Keyes of New Orleans. The child, who is fifteen years of age, attends school as a boarding student at the Sager-Brown Home in Baldwin Louisiana, an institution for colored children, situated approximately four miles from Franklin.
 

 After a trial of the issues of the case formed by the allegations of the petition of relatrix, Mamie Lucille Munson, and by those of the answer of respondent, Alma Jackson, the district court recalled the previously issued writ of habeas corpus and ordered the suit dismissed at the costs of relatrix. She appealed.
 

 In the early part of 1931, while living in Chicago Heights, Illinois, relatrix was required to spend considerable time away from her home, particularly at night, she then being engaged in selling what she described as policy' or lottery tickets. As a consequence she employed the next door neighbors, Sarah and' Hudson Keyes, for an agreed weekly payment of $5, to care for in their home the daughter Delores (born July 6, 1930), as well as her other illegitimate child, Romona (born December 6, 1928). A few months after the confection of this arrangement a dispute arose about the welfare of Dolores, resulting in the voluntary appearance of Sarah Keyes and relatrix before a police magistrate of Chicago Heights. On the suggestion of this official, obviously acting in the capacity of a conciliator, relatrix gave to Sarah Keyes written authorization (thereafter misplaced or lost) for the enjoying of custody of the child Dolores. According to relatrix the instrument or letter merely stated that she was willing for Sarah “having my child as long as I was able to pay her and while she (Sarah) was living in Chicago Heights.” The Keyes, on the other hand, considered Dolores to be their child following the appearance before the magistrate and the execution of the custody authorization.
 

 On September 7,. 1931, the Keyes left Chicago Heights and moved to a farm near Bogalusa, Louisiana, on which farm Sarah "Keyes had been reared and in which she owned an interest by inheritance. Accompanying them were three children of Hudson Keyes by a former marriage 'and the child Dolores. In this new location the latter was cared for and maintained as a child of the Keyes, sent to school by them, and given their name.
 

 
 *6
 
 On becoming seriously ill during the early part of 1943, and contemplating death, Sarah Keyes summoned to her bed side Alma Jackson, she being the respondent herein, a half sister, and a resident of Franklin. Sarah then and there requested respondent to care for Dolores and provide for a continuance of her education, giving assurance at the time that Hudson Keyes would pay all expenses. Sarah died February 26, 1943.
 

 For several months after Sarah’s death Dolores lived with respondent in Franklin and attended school in that vicinity. On the completion of that school term, she returned to Bogalusa and spent the vacation period with Hudson Keyes and respondent’s mother.
 

 In the fall of 1943, she was placed as a boarding student in the Sager-Brown Home near Franklin, at an approximate cost to Hudson of $150 per year, this action being thought advisable by respondent and Hudson because of the fact that the former’s duties as a nurse with the St. Mary Parish Health Unit often called her away from home at night. The named institution, primarily an orphanage for colored children but which accepts boarding students whose custodians cannot give adequate supervision because of their employment, is endowed and operated by a religious organization. It is recognized by the State Department of Education as a school and by'the State Department of Public Welfare as a home for children.
 

 About the time that Dolores commenced the fall school term, Hudson Keyes obtained employment in the ship yards in Morgan City, and, while carrying on his work there, roomed at respondent’s home in nearby Franklin. Some months later he became employed by the Delta Ship Building Company in New Orleans at a wage of $51 per week.
 

 The record abundantly discloses that the child has been well cared for since her removal to Louisiana. While living near Bogalusa between 1931 and 1943, she was provided for the same as were the children of Hudson Keyes. Following the death of Sarah Keyes, both the respondent and Hudson Keyes continuously displayed an almost parental devotion to Dolores, at all times manifesting a keen interest in her welfare and betterment; and it is apparent that they have been and are exerting every effort in aiding her to realize her ambition, that of becoming a nurse. Not only has Hudson Keyes adequately furnished to her all the necessities of life (he now has no dependents and earns good wages), but also he has visited her often, has taken her to church with him at least once a month, and has remembered her with various gifts during Christmas and other holidays. The respondent, Alma Jackson, sees the child in the Sager-Brown Home almost every day. That Dolores is contented under the present arrangement is shown by her own testimony. She emphatically testified that she always gets the things she needs, that she likes
 
 *8
 
 the place where she goes to school, and that she is happy there.
 

 In this proceeding relatrix contends strongly that the child was kidnapped and abducted from Chicago Heights, and brought to or near Bogalusa by Hudson and Sarah Keyes; that following a relentless search which continued for many years and as a direct result of a radio broadcast, she found Dolores at the Sager-Brown Home in the custody of Alma Jackson. Of course, respondent and also Hudson Keyes deny the accusation of kidnapping and abduction, both of them maintaining that relatrix gave the child to the Keyes.
 

 The trial judge heard and received much evidence on this issue of fact and resolved it in favor of respondent. Our close study of the record leads Us to the same conclusion. In well-considered written reasons for judgment he states “that Lucille’s (relatrix’) position that her child was abducted from Chicago Heights in September, 1931, and was taken to parts unknown is not impressive.” Then, in support of this statement, he analyzes the evidence and points to numerous circumstances indicating that relatrix had knowledge of the departure of the Keyes from Chicago Heights and of their intended destination. Among these were the several days’ preparations made for the removal, the fact that she was quite friendly with the neighbors who packed and shipped the Keyes’ furniture and other household articles, and a letter purportedly written by relatrix to Sarah Keyes a few months after the latter and her husband arrived near Bogalusa. In this letter the writer, referring to the child, stated that “I have heard that she was fine happy and fat as she can be and has a good home”, and, further, “don’t weary (worry) there will be no trouble from me.”
 

 Finally, relatrix insists that she is legally entitled to the custody of her child, irrespective of the issue of kidnapping and abduction. Unquestionably it is the law of this state that parents have the natural and legal right to the care and custody of their minor child. Such right, however, is not absolute; it must yield to the superior right of the state whenever the child’s moral, physical and mental welfare requires it. State ex rel. Castille v. Cooke et al., 183 La. 404, 164 So. 153; State ex rel. Harris v. McCall, 184 La. 1036, 168 So. 291; State ex rel. Conerly v. Sonier, 209 La. 138, 24 So.2d 290. And this doctrine is applicable to a child born out of wedlock as well as to a legitimate offspring. State ex rel. Wilson et al. v. Pierre et al., 155 La. 510, 99 So. 421.
 

 From the evidence adduced at the trial of the instant case, which included a written report based on investigations made both by the Louisiana Department of Public Welfare and the Cook County Bureau of Public Welfare, Chicago, Illinois, the district judge concluded that the awarding
 
 *10
 
 of custody to relatrix would be inimicable to the welfare and best interest of her child. In this connection he observed:
 

 “Therefore, we are left only with the simple consideration of whether or not the alleged unfitness of the mother is such as to deprive her of the custody of her daughter. I am of the opinion that the welfare of the daughter would be seriously jeopardized if she is sent to her mother. This case is somewhat parallel to the Succession of Tate, 168 La. 834, 123 So. 590. In that case the mother was deprived of the custody of her child on account of living with different men. We have the same condition here. The Supreme Court held that this constituted such immorality as to deprive the mother of her child’s custody. We must reach the same conclusion here.
 

 “Lucille (relatrix) is still a young woman, It is true that no evidence has been introduced regarding her recent conduct, except as to her general reputation. But it must be remembered that her testimony is the only one (testimony) given by members of her race from Chicago. She has made a substantial income only recently, and there is no way of knowing how long this will last. If her morals have improved, there is no way of knowing how they will be affected by financial reverses.
 

 “Dolores (the child) is a young girl of 15 years. She is attractive and practically grown in body. We are certain that her living conditions at present are of the finest kind. She is receiving the best kind of moral and religious education. Her chances-of achieving her ambition of being a nurse are very good. I believe, therefore, that to disturb her at this time and possibly expose her to the life her mother was leading at her age would be detrimental to her morals and career. Considering her age, it can be presumed that in a short time she will be on her own, and will have reached the age where she can reason for herself. Should she then feel that she should go to live with her mother, she will be at liberty to do so.
 

 “Should conditions change, either with Dolores, or with her mother before Dolores arrives at the age where courts cannot control longer her living conditions, the mother, upon proper showing, can always obtain the custody of her daughter.”
 

 Relatrix, according to her own testimony, was fourteen years of age when Romona was born and fifteen on the birth of Dolores. Eleven years later (1941) she had another child. All three, she admitted, were illegitimate children and no two of them have the same father. It was to the improper relationships resulting in these births that the trial judge especially alluded when he commented that relatrix had been living with different men and, further, that to possibly expose the child to “the life her mother was leading at her age would be detrimental to her morals and career.”
 

 
 *12
 
 It is our opinion that the evidence as a whole, particularly the admissions of relatrix as to her immorality and the findings of the social agencies which thoroughly investigated this unfortunate situation, amply sustains the conclusion that the moral, physical and mental welfare of the child will be best promoted by leaving her in the custody of respondent.
 

 The judgment is affirmed.
 

 ;' O’NIELL, C. J., absent