170 So.2d 549 (1965)
STATE ex rel. Mildred PAUL, Plaintiff and Appellant,
v.
DEPARTMENT OF PUBLIC WELFARE of the State of Louisiana, through the State Director of Public Welfare of the State of Louisiana, et al., Defendants and Appellees.
No. 1326.
Court of Appeal of Louisiana, Third Circuit.
January 5, 1965.
*550 J. Vance Thompson, Alexandria, for plaintiff-appellant.
Richard L. Latimer, Baton Rouge, for defendant-appellee.
EN BANC.
HOOD, Judge.
This is a habeas corpus proceeding instituted by Mildred Paul to obtain the custody of her infant child, Timothy Paul, who by order of court has been placed in the care and control of the Louisiana Department of Public Welfare. The suit was instituted against the Department of Public Welfare and against Carl Smith, chief probation officer of Rapides Parish, Louisiana. After a hearing, judgment was rendered rejecting plaintiff's demands, and plaintiff has appealed.
Plaintiff is a 35-year-old unmarried white woman. The child whose custody is being sought was born on March 3, 1964, at the Huey P. Long Charity Hospital in Pineville, Louisiana. A few days after the child was born plaintiff was summoned to appear at a hearing scheduled to be held in the juvenile court for Rapides Parish, Louisiana, to determine her right to the custody of the child. Following that hearing, judgment was rendered by the juvenile court on March 17, 1964, placing the custody of the child temporarily with the Department of Public Welfare of the State of Louisiana. The child has been in the custody of the Department of Public Welfare continuously since that time.
This habeas corpus proceeding was instituted on July 27, 1964. A hearing was held in due course, and judgment was rendered by the trial court on August 24, 1964, decreeing "that the rule be recalled and that the judgment of March 17, 1964 remain unchanged." The trial judge assigned as reasons for that decree that "the best interest of the child would be served by leaving him in the custody of the Department of Public Welfare as the petitioner cannot properly care for the child."
Plaintiff contends that she is mentally and physically able to care for the child, and that the trial court erred in rejecting her demands for custody. Defendants contend that plaintiff is not mentally capable of caring for the child, and that it would be detrimental to the child to return him to the custody of the plaintiff.
The evidence shows that plaintiff is in good physical health. She has a congenital motor speech defect, however, which is of such a nature that it is impossible for her to speak words or to communicate orally with anyone other than her mother, who has learned to understand what plaintiff is trying to say. Plaintiff has a very low level of intelligence, having an I.Q. of about 45 and a mental age of about 7.3 years. The experts in psychology who examined her classify her as either a low-grade moron or a high-grade imbecile. Although plaintiff testified that she went to the seventh grade in school, she is unable to read and write, other than to sign her name, and it is clear from the evidence that she would not be able to qualify for the seventh grade in any ordinary school.
Plaintiff lives in a small house with her 72-year-old mother and with two of her sisters, and both of these sisters have a lower level of intelligence than does plaintiff. Her older sister, who is 44 years of age, suffered polio while a young child and has been *551 paralyzed on her left side since that time. This sister also has a speech defect similar to that of plaintiff, and she has an I.Q. of 31 and a mental age of between 2.8 and 4.7 years. She is definitely an imbecile. Plaintiff's younger sister is 31 years of age, and she has an I.Q. of 34 and a mental age of 5.8 years. The mother is classified as mentally dull, but she has a higher intelligence quotient than any of the daughters.
The house in which these four adults live is a small, three-room, unpainted frame house, located in a wooded rural area about 14 or 15 miles from the city of Alexandria, which they rent for $10.00 per month. The house is equipped with gas and electricity, but the water which they need is supplied by a pump located outside the house with a rubber hose leading from this pump into the building, and water is obtained inside the house by operating a nozzle on the end of this hose. The furniture or appliances in the house include four double beds, an electric washing machine, a wood stove and a gas stove. The evidence indicates that in spite of their mental limitations, plaintiff and the other occupants of the house keep the house in a a fairly clean and orderly condition, and that plaintiff generally dresses neatly.
Prior to the time plaintiff moved to this home, about four years ago, she lived with her parents and other members of the family near Columbia, Louisiana. While living there she was required by her father to work in the fields from early hours in the morning until late at night. The family apparently lived in poverty, and plaintiff had no opportunity to go anywhere. Psychologists and lay witnesses indicate that she is able to perform work in a field, such as picking vegetables and fruits, hoeing cotton and other similar types of work, without supervision. She also is able to cook and to can or preserve fruits and vegetables. She unquestionably loves the child and wants to obtain custody of it.
Neither plaintiff nor any of the other occupants of the house are employed, and they have no income or means of support other than the assistance which is given to them by the Department of Public Welfare. Although plaintiff may be capable of performing work of some menial type, none of the other members of the household are capable of holding any type of employment at all.
Dr. Ralph Ware, a psychiatrist employed at Central Louisiana State Hospital, examined plaintiff on two occasions, once shortly before the child was born and a second time after the birth of the child. Although he did not test her I.Q., he concluded that "she is a borderline mentally defected" person. He testified that she walks well, handles her hands well, knows the time of day, knows the difference between hot and cold, knows the day of the week, and she can perform common ordinary tasks at home well, such as cleaning, cooking, canning, bathing and dressing. In his opinion, plaintiff could handle the bringing up of this child. He feels there would be no danger to the child, and that plaintiff "would do the best she could" to raise him. He concedes that plaintiff could not teach the child to speak, that she could not help him with his school lessons, and that the environment is not good, but he feels that plaintiff can take care of the physical needs of the child, and that she can provide a mother's love.
Dr. Robert H. Cassell, chief of psychological services at Pinecrest State School, examined plaintiff and her two sisters on January 13, 1963. He feels that plaintiff can give the child love and affection, and could care for it as long as only routine care is required. In his opinion, however, plaintiff would not be able to function if something of a non-routine nature occurred. She, for instance, could not determine when the child was sick, what is dangerous and what is not dangerous, or when the child should be taken to a doctor. He thinks the probability of plaintiff being able to nurse and raise her child are poor. He feels that *552 she might routinely nurse the baby with a bottle, but he has great concern as to whether she would be able to cope with an emergency.
Mr. Bernard Phelps, a psychologist who is serving as psychological assistant at Pinecrest State School, examined plaintiff on January 13, 1964. He feels very strongly that plaintiff is mentally incapable of taking care of the child. He testified that awarding custody of the child to plaintiff would result in "utter havoc for the child's concern, for the parent's concern, and some question as to the survival of the infant."
The lay evidence is conflicting as to whether plaintiff is or is not able to care for the child. Four neighbors or acquaintances of plaintiff testified to the effect that plaintiff is able to count money, that she dresses neatly, that she does not conduct herself in a disorderly manner, and that the home is kept reasonably clean. One of these witnesses stated that she feels that plaintiff is able to care for a child, and that she would have no hesitancy in leaving her own grandchild under plaintiff's care. A children's case worker for the Department of Public Welfare testified that the child is presently being cared for in a foster home provided by the Department of Public Welfare and that he is receiving good treatment. She also stated that the child has a tendency to upper respiratory infection, that he has been sick frequently, that it has been necessary to have him treated by a pediatrician, and that the child was hospitalized for four days on one occasion. A welfare visitor, who is employed by the Department of Public Welfare and who has visited in the home, expressed the opinion that plaintiff is not able to care for the child, and that the child is in need of protection because of the environment and the mental limitation of the mother.
On this evidence, together with the testimony of plaintiff and of her mother (plaintiff's testimony being interpreted by her mother), the trial judge rejected plaintiff's demands.
The law is settled that a mother has a right to the custody of her child as against third persons, but that this right must yield to the superior right of the state to deprive her of such custody in the event she is morally, mentally or otherwise unfit or incapable of caring for the child, or the welfare of the child requires it. State ex rel. Guinn v. Watson, 210 La. 265, 26 So.2d 740; State ex rel. Mouton v. Williams, 222 La. 457, 62 So.2d 641; State ex rel. Castille v. Cooke, et al., 183 La. 404, 164 So. 153; State ex rel. Brode v. Hatcher, 233 La. 636, 97 So.2d 422; Mouton v. St. Romain, 245 La. 839, 161 So.2d 737; State ex rel. Rothrock, et ux. v. Webber, et ux., 245 La. 901, 161 So.2d 759; State ex rel. Cockerham v. Jordan, La.App. 2 Cir., 134 So.2d 81.
The love of a mother for her child is one of the most powerful of human emotions, and in custody cases it is a most important factor to consider in determining what is best for the child's welfare. The mere fact that the defendants may be better able than the mother, financially and otherwise, to take care of the child does not warrant the court in refusing to recognize the right of the mother to the custody of her child. State ex rel. Monroe v. Ford, 164 La. 149, 113 So. 798. In a contest between a mother and a third person for the custody of a child, the mother is entitled to obtain custody unless it is shown that she is morally, mentally or otherwise unfit or incapable of caring for the child, or that for some other reason it would be detrimental to the child's health, safety or welfare to place him under the care of the mother. State ex rel. Sevier v. Sevier, et al., 141 La. 60, 74 So. 630; and State v. Miller, supra.
The burden, of course, is on those resisting the parent's demand for custody to show that the latter is disqualified or unfit to have the custody, that the parent is incapable of caring for the child, or that it would be detrimental to the child's welfare to place him under the care of the *553 parent. Mouton v. St. Romain, supra; State ex rel. Martin v. Garza, 217 La. 532, 46 So.2d 760; State v. Miller, supra; State v. Hatcher, supra.
Although the natural parent's right to the custody of his or her child is superior to that of another relative or stranger, courts should and will consider the mental health of the parent along with other factors in arriving at a custody award best serving the welfare of the child. State ex rel. Mouton v. Williams, supra; State ex rel. Castille v. Cooke, supra; State ex rel. Monroe v. Ford, 164 La. 149, 113 So. 798; 74 A.L.R.2d 1085.
In State ex rel. Castille v. Cooke, supra, where the mother's demand for custody was rejected because of her mental health, our Supreme Court said:
"There is no dispute as to the law governing the case. It is conceded that the mother has a superior right to the custody of her child over the grandmother and aunt. (numerous citations omitted)
"The only question presented is one of fact, i. e., whether or not the mother's mental condition is such that it would be detrimental to the mental and physical well-being of the child to permit her to live with her mother.
"The doctors agree that a person who is suffering from serious mental and nervous disorder will conceal the things they love for fear of losing them and sometimes, if the fear is very great, will destroy the object of their affection for the purpose of preventing it from being taken from them. The medical testimony convinces us that if this little girl, who is highly nervous, and, according to the doctors, who testified in behalf of the mother, susceptible to the same nervous condition that her mother suffers from, were permitted to remain in an environment created by an unbalanced mind, she would become neurotic.
* * * * * *
"After carefully reviewing the record, we are constrained to differ with the learned judge ad hoc and the two doctors in their view that the mother is capable of caring for her little daughter. It is our opinion that the physical and mental welfare of the child requires us to deny the mother's plea."
And in State ex rel. Mouton v. Williams, supra, where the mental health of the mother was an important factor in determining the custody of the child, the Supreme Court held:
"It is well settled in our jurisprudence that a mother has a right to the custody of her child as against third persons, but that this right must yield to the superior right of the State to deprive her of such custody and possession in the event she is morally, mentally, or otherwise unfit and the welfare of the child requires it.
* * * * * *
"The medical evidence is uncontroverted that the mother has in the past suffered attacks of a mental illness of such nature that it may recur, but the record reveals little or nothing of her actions, symptoms, and mental state when these attacks occur. There is not sufficient evidence in the record to give us a clear and complete picture of the environment of the mother's home where the child once lived and where she will again live if placed in her mother's custody. We cannot, therefore, in the present condition of the record decide this serious and vital matter, and for this reason we have concluded to remand the case for the taking of additional evidence."
In matters involving the custody of children, we particularly give great weight to the findings of the trial judge and we are reluctant to reverse his conclusions, because he has had an opportunity *554 to observe the persons who are claiming the custody and the witnesses who testified at the trial. See State v. Jordan, supra; and Mouton v. St. Romain, La.App. 3 Cir., 153 So.2d 890 (affirmed on cert. at 245 La. 839, 161 So.2d 737).
The evidence in the instant suit convinces us that plaintiff loves her child and would be able to provide him with routine physical care. The evidence also establishes, however, that she would not be able to provide some of the training which the child must have, such as the ability to speak, or to properly care for him in case of sickness or emergencies. It would be unrealistic, of course, to assume that no illness or emergencies would occur in the raising of a child. The evidence also indicates to us that the home environment, with two mentally retarded adults besides the mother living in the same small house, would be detrimental to the physical, moral and mental welfare of the child.
Under the facts presented in the instant suit we must agree with the trial judge that plaintiff is not able, primarily because of her mental limitations, to care for the child, and that the welfare and best interest of the child would be served by allowing him to remain in the custody and care of the defendants.
We know that the plaintiff in this case loves her child, and we assume that in spite of her limitations she will experience the deep heartache which must accompany a judgment of this kind. It is with considerable regret, therefore, that we find it necessary to reject her demands. A judgment involving custody, however, is always revocable where conditions warrant its modification. If there should be a substantial improvement in plaintiff's ability to care for the child and in the home environment, then it may be that in subsequent proper proceedings a modification of the judgment will be justified.
For the reasons herein set out, the judgment appealed from is affirmed. All costs of this appeal are assessed to plaintiff-appellant.
Affirmed.
TATE, J., concurs and assigns written reasons.
TATE, Judge (concurring).
The majority opinion has fairly stated the surrounding facts concerning the serious problem before the court: Should a mother of low intelligence be deprived of her child because a more favorable environment might produce a better chance of favorable development for the child?
However, I must frankly state that, based on the transcript of evidence alone, I think it would be manifestly wrong to deprive this mother of her child, were the child still with the mother.
The mother is a healthy and clean young woman of 35, who keeps house, cooks for her sisters, and manages her shopping and other normal activities of life. She has no vicious or immoral habits, and aside from the birth of this illegitimate child apparently has lived a respectable life. While it sounds bad to say that she is a low-grade moron with an IQ of 45-50, on the other hand the evidence indicates that there are many, many low-grade morons living normal lives in paying jobsthat a person of such a capacity has the ability to care for herself, to take care of children (in fact, the State Colony uses low-grade morons to take care of retarded children left there), and to fend for themselves in the routine activities of life. Perhaps for a lay person a more accurate impression of the mother's mental capacity is conveyed by the classification of her under another accepted psychologic scale, as "borderline mentally defected", Tr. 56, or one with "moderate mental deficiency", Tr. 57.
The testimony of the mother herself at the trial is sensible and straightforward and seems to corroborate the testimony of *555 an examining psychiatrist (Dr. Ware) that the mother has good judgment.
A further complication here, however, is that the mother and additionally her two sisters have a speech defect. (This no doubt gave social workers casually observing her an impression of greater mental deficiency than was justified.) The trial court apparently gave this speech defect great weight, as its questioning was concerned with whether this might not handicap the development of normal speech in the child, and how could these moronic parents and guardians help the child with homework, or provide a normal social growth for the child.
All these are undoubtedly matters of great concern. It is difficult not to agree that a better environment for the child could be provided than the mother's home. But this is not the legal question: for the mother's paramount right to custody must be respected unless such would be detrimental to the child's health, safety, or welfare.
In America, unlike in communistic or other totalitarian countries, the state's function is not all-powerfully to rearrange families and take control of children just because some social workers (however well-intentioned) feel it might be better. The right of parents to their own children comes from God, not the state. In the absence of abandonment of this right by the parent, or active detriment to the child, the state just simply cannot disrupt the Godcreated relationship of parent and child.
Because parents are poor or stupid or have speech defects, can be no reason by themselves to take a child from its mother. It may well be that a given child might have had a better chance in life had it been born in a different home, but that again by itself does not give the state the power to deprive a mother of her child.
The evidence is very strong in favor of the mother's ability to take care of the child suitably in accordance with their station of life. Four neighbors very much familiar with the mother and her home are positive to this effect, as is the only psychiatrist testifying, a Dr. Ware employed at the state mental hospital.
The chief of psychological services there, a Ph.D. psychologist, Dr. Cassell, was of the contrary opinion; but based only on the idea that in emergencies of a nonroutine nature the mother might not function properly, or might not recognize serious illness. This very fair expert witness also stated frankly, "there is no question in my mind that this kind of person can give love and affection [to children] and there is no argument as to that."
The other evidence of maternal incapacity is, to me, almost weightless: a welfare worker who worked a month or so with the mother when she was pregnant and visited her four to six times, Tr. 95 (after the welfare department had already determined the child should be removed from the mother despite her desire to keep the child); a psychologist who tested the sister (not the mother), but who incidentally saw the mother for a matter of twenty minutes (Tr. 129) while she was in a waiting room (this was the witness who testified as to the "utter havoc for the child's welfare" posed by the mother's custody! Tr. 130); some welfare department case reports, hearsay (and anonymous hearsay at that), concerning the unfavorable environment which are refuted by the only sworn evidence in the record, the testimony of the four neighbors.
No reported case in Louisiana, nor elsewhere so far as I have been able to ascertain, has yet held that a person of low intelligence but capable of taking care of herself and her child (for this sums up what a borderline defective or a low-grade moron is) should be deprived of custody of her child on account of that low intelligence. Nor has any decision yet held that a parent with a speech defect cannot retain custody of her child because the child's ability to learn to speak might be impaired. For instance, State ex rel. Mouton v. Williams, *556 222 La. 457, 62 So.2d 641, relied upon by the majority, held that the mother might be deprived of custody of the child because of a mental condition; but the mental condition there involved was a maniac-depressive psychosis. It was the possibility of homicidal tendencies or physical harm to the child or the child's subjection to severe physical, mental, and emotional strain that concerned the court there. 62 So.2d 642.
And there is another factor that has disturbed me.
Here, the child has been taken from its family and placed in a foster boarding home which boards other welfare children in return for subsistence payments by the welfare department. There is no evidence whatsoever as to the child's individual capacities or possible defects, and perhaps none is possible at such an early age.
But, picturing the child as a normal middle-class child, we have assumed that any environment at all is better than that which the loving mother can afford this baby boy. But what if the child is of the same physical and mental class as its mother? Is it really better to board it out with strangers caring for it and other children for compensation, than to leave such a child in the only home in the whole wide world in which mother-love will recognize the miraculous wonder that God has breathed life and a soul and a need to love and to be loved into this misshapen clay? In which mother-love will see this retarded child, not as a creature to be boarded in return for pay, but as a wonderful being and the shining center of its tiny, family world in which it is warmly loved?
And even though the baby boy might be normal, he may indeed have better social development going through life as a paid boarder in the welfare's foster homes in which he is put as he proceeds towards adulthood (for he cannot be adopted without the mother's consent); but can we be truly certain that we have without doubt done the best thing for the child's welfare by sentencing him to an emotionally empty life, a waif without family, not harbored within the cherished security of the love of his own mother and of his own family?
Another disturbing factor is that before the child was even born, social workers, no doubt well-intentioned, had decided that the baby should be removed from its mother after its birth despite her objections. Immediately after birth, the child was taken, and at a custody hearing at which the mother did not appear (in effect, an ex parte hearing), on the apparent basis of hearsay case reports of a social worker (which the sworn evidence of neighbors at the trial refutes, the only uncontradicted sworn first-hand evidence in the record). We do not have an instance where the mother had custody of the child and was unable to take care of it; the child was taken from the mother immediately after birth, on fears that the mother might not be able to care properly for her child, before the mother had a chance to prove her capacity or incapacity to take care of her own child.
But this is the dilemma in which the courts are placed: We know (from hearsay evidence to this effect of a social worker) that the infant is adjusted and in good health in its present environment. We have the testimony of a respected and apparently fair psychologist witness (Dr. Cassell) that he does not think the mother's intelligence is sufficient in case of emergencies to take care of her child. Despite expert medical testimony (Dr. Ware), contrary to these forebodings, the strong testimony of neighbors to the contrary, and also the more or less common sense impression from the testimony that this mother should at least have been given a chance to care for her child and would probably have been able to do so succesfullyyet we are faced with the fait accompli that the child is doing *557 well in its present environment, and might not do so as well and might even be endangered (if an emergency illness arose) if returned to its mother's care.
On these narrow grounds just stated, and also because the trial court which saw and heard the witnesses might have some reason to discount the testimony favorable to the mother which reads so strongly in the transcript, I concur for the present in the dismissal of the mother's claim for the return of her child.