HOOD, Judge.
Dr. William F. Toler has appealed from a judgment of the trial court decreeing his six minor children to be neglected and placing them in the care and custody of the Louisiana State Department of Public Welfare.
The principal issues presented are whether the evidence establishes that the children are “neglected,” as that term is used in LSA-R.S. 13:1569 and 1570, and whether the proof warrants the removal of the children from the custody of their father.
Dr. Toler, a prominent dentist who practices in Opelousas, is the father of seven children. His oldest child is married, but the remaining six children are minors, and on February 6, 1972, they lived with their father in the latter’s spacious home located in or near Washington, a few miles north of Opelousas, Louisiana. Toler’s first wife, the mother of these children, died about four years ago. He remarried after her death, but his second marriage terminated in a divorce.
On Sunday evening, February 6, 1972, the doctor’s 12-year old son, Frankie, refused to come into the house or to quit throwing rocks at the side of the building when instructed to do so by his father. Dr. Toler thereupon picked up his fully loaded pistol, and after removing a safety attachment from it, he walked out of the house into a carport and fired the pistol into the air. The bullet struck the ceiling of the carport. The doctor explains that the shot was fired because he felt that the loud noise would cause Frankie to come back into the house. The noise, however, did not have that effect. Frankie ran away from the house when his father emerged from it with a pistol, and after the shot was fired the boy proceeded approximately a mile to the home of a family friend, Charles Olivier, to whom he reported the incident. Olivier then contacted the sheriff’s office and the district judge.
About four hours after the shooting occurred, or about midnight, the district judge and two deputy sheriffs went to Dr. Toler’s home to investigate the reported shooting and to talk to the doctor. As a result of that visit, the district judge decided to remove the three minor boys from the custody of the father. The judge, while in the doctor’s residence, telephoned a local priest and arranged for Dr. Toler to go immediately to the priest’s home. The doctor thereupon voluntarily went to the priest’s home and he spent the rest of the night there.
On the following morning, February 7, the trial judge issued an ex parte order decreeing that all six of the minor children were “made wards of the Court and are taken into its protective custody;” that the “temporary care and immediate physical possession” of the three minor sons of Dr. Toler was granted to Charles Olivier; and that Dr. Toler was awarded the “temporary care and immediate physical possession” of his three minor daughters.
The three boys were taken to the home of Charles Olivier that night, and they have not been returned to the custody of Dr. Toler since that time. The doctor’s three minor daughters remained in his home for four or five days after that date.
*661 On Thursday evening, February 10, Dr. Toler’s 14 year-old daughter, Francezica, ran away from home after being told by her father to take a bath. This was reported to the sheriff’s office, and two or three patrols were dispatched to search for the girl. The trial judge, upon being notified of this occurrence, again went to the Toler home with a deputy sheriff about 1:30 A.M. The judge stated that he went “because of concern that the father’s condition had become dangerous,” that he found Dr. Toler “unusually excited,” and that he “became concerned as to whether he (Dr. Toler) would maintain his control throughout the night.” Dr. Toler talked to his attorney by telephone while the trial judge was there, and after doing so he agreed “to go sit up with the desk sergeant at the Washington Police Station for the rest of the night.” The daughter, France-zica, was found and returned to the Toler home later that day.
On Friday, February 11, the trial judge issued another ex parte order, rescinding and revoking the previous order which had been issued on February 7, and decreeing that the temporary and detentive care of all six of Dr. Toler’s minor children was awarded to the Louisiana State Department of Welfare, all pending further orders of the court. The three girls thereupon were removed from their father’s custody and have not been returned to the Toler home since that date.
The trial judge promptly scheduled and held a hearing on the issue of whether the six children should be decreed to be neglected under the provision of LSA-R.S. 13:1561 et seq. The hearing was held on February 11 and on February 15, 1972. Dr. Toler and his two attorneys were present at, and they actively participated in, that hearing.
At the conclusion of the trial, the trial judge concluded that “the said juveniles are within the purview of the statute as neglected children and are in need of the protection of the State.” He thereupon rendered judgment on February 16, 1972, decreeing that all six of Dr. Toler’s minor children were “within the purview of R.S. 13:1561-1580, and are neglected children and otherwise in need of the protection of the State, and their care and custody are awarded to the Louisiana State Department of Public Welfare, all subject to further orders of this court.” Dr. Toler has appealed from that judgment.
The law is settled that the natural parent has a superior right to the custody of his child, but that this right must yield to the paramount right of the State to deprive him of that custody in the event he is found to be morally, mentally or otherwise unfit or incapable of caring for the child, or if the welfare of the child requires it, or if it is shown that the parent would likely subject the child to neglect or bad influences. LSA-C.C. arts. 26 and 215 et seq.; In re State ex rel. Thoman, 253 La. 496, 218 So.2d 571 (1969); State ex rel. Paul v. Department of Public Welfare, 170 So.2d 549 (La.App. 3 Cir. 1965).
There is a presumption that the welfare and best interest of the child will be served by reuniting him with his natural parents, and the courts are reluctant to interfere with this parental right to custody, except under exceptional circumstances. The burden is on the party resisting the parent’s demand for custody to show that the latter is disqualified or unfit, or that it would be detrimental to the child’s welfare to place him under the care of the parent. Lindsay v. Finch, 240 So.2d 405 (La.App. 2 Cir. 1970); State ex rel. Lombardo v. Miller, 232 La. 617, 94 So.2d 888 (1957); State ex rel. Paul v. Department of Public Welfare, supra.
LSA-R.S. 13:1561-1592 vests jurisdiction in the juvenile court to decree a child to be a “neglected child” or a “delinquent child.” Our concern here is whether the six Toler children should be decreed to be neglected children within the meaning of those statutes. A “neglected child” is de *662 fined in LSA-R.S. 13:1569 and 1570 as a child:
“(1) Whose parent or other person legally responsible for the care and support of such child neglects or refuses, when able to do so, to provide proper or necessary support, education as required by law, or medical, surgical or other care necessary for his well-being; or who is abandoned by his parent or other custodian ; or who is otherwise without proper care, custody, or support.
“(2) Whose occupation, behavior, environment or associations are injurious to his welfare.”
A number of witnesses testified at the trial. A substantial part of the evidence was hearsay testimony, consisting of statements made by the children to some of the witnesses. None of the children were present at the hearing, and none of them testified. At the trial respondent objected to the admission of hearsay evidence. This objection was overruled, and the objection and ruling were made general to all hearsay testimony. Respondent argues here that the trial court erred in admitting and considering this hearsay testimony.
LSA-R.S. 13:1579.1 provides:
“In the hearing of all cases under this Part, involving petitions of juvenile delinquency or neglect, all facts connected therewith and all surrounding circumstances, including the environment and history of the child, together with any character of evidence, including hearsay evidence and opinion evidence which the court, in its discretion, may deem proper, may be admissible, and the testimony of the probation officer assigned to the case shall be admissible.” (Emphasis added)
The Fourth Circuit Court of Appeal held in State v. Toole, 173 So.2d 872 (La.App. 4 Cir. 1965), that the quoted statute confers on the juvenile court the “unusual judicial prerogative” of considering and evaluating hearsay evidence. The Second Circuit Court of Appeal has held, however, that hearsay testimony is not admissible in proceedings of this kind and that such evidence should be excluded. See In re State in Interest of Elliott, 206 So.2d 802 (La. App. 2 Cir. 1968). In Elliott, the Court assigned the following as one important reason for its holding:
“If it could be said that the statute makes admissible in evidence hearsay and opinion evidence and ex parte statements, such exception to the general rules of evidence would itself be abrogated by the decision of the United States Supreme Court in In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).”
The Elliott decision was discussed in Pugh, The Work of the Appellate Courts for the 1967-1968 Term-Evidence, 29 La. L.Rev. 310 (1968), at page 319. Therein, it was properly noted that the Gault decision dealt with a juvenile proceeding which could lead to confinement, or what would be styled a delinquency proceeding as distinguished from a neglect proceeding. Regarding the Elliott case, the author concluded that “it is more questionable whether it (Gault) will be extended to preclude such hearsay in child neglect cases such as the instant (Elliott) proceeding.”
We have great respect for the views expressed by our brothers of the Second Circuit Court of Appeal, but we feel that we must disagree with them on this issue. In our opinion Gault does not apply in a neglect proceeding such as this. The statute specifically authorizes juvenile courts to admit and consider hearsay and opinion evidence in cases of this kind, and we find no constitutional or other basis for denying the juvenile court that authority. We hold, therefore, that hearsay testimony is admissible in this case, and that the trial court did not err in admitting and considering such testimony.
The evidence shows that Dr. Toler attended the University of Alabama, in Birmingham, for about two years after the *663 death of his first wife, and that upon completion of his studies there he became certified as a prosthedontist. He returned to Louisiana in August, 1971, and has practiced as a specialist in that field in Opelou-sas since that time. His mother, Mrs. Alice Toler, took care of his six minor children while he was in Alabama, except that one of his sons, Frankie, lived with Charles Olivier for about eleven months during that period. The children resumed living with their father when he moved back to Louisiana, and all six of them lived with Dr. Toler from August, 1971, until their custody was removed in February, 1972. Respondent’s mother, Mrs. Alice Toler, assisted in caring for the children while they were living with their father. The evidence shows, however, that she and the father, Dr. Toler experienced a number of disciplinary problems with the children during the five month period while the children were living in the Toler home.
The testimony of Charles Olivier, who lives near Dr. Toler and has known him for several years, is convincing to the effect that the doctor has neglected his children. This witness stated, for instance, that one of the doctor’s young sons had been run away from the home with no clothes on, when the weather was around 30 degrees, that the child “can’t go back to his own home,” and that Olivier gave him shelter. He stated that the Toler home was very dirty, that the children complained of being insufficiently fed, that some of the children had to sneak into the house to get food, and that they were fearful and apprehensive of their father. He quoted the child, Frankie, as saying that his father had beat him with his fist and had thrown him against the wall, that the doctor had taken out a pistol about four weeks before the hearing and that the child’s 14 year-old sister, Francezica, had told Frankie “to run for his life.”
Olivier testified that Dr. Toler told him on February 4, just two days before he fired a pistol into the ceiling of the car-port, that “he didn’t give a damn about the boys, and that he didn’t want them back at home.” A nine year-old son of Dr. Toler was quoted as saying that his father had thrown a stool at him, but that he ducked and that the stool struck a window, breaking nine panes of glass. The witness also stated that the doctor’s mother, Mrs. Alice Toler, told him that the respondent had struck her with his fists, leaving bruises on her body, and that he had taken her glasses from her and stomped them on the floor. He testified that five weeks before the hearing was held, Mrs. Toler asked Olivier to assist her in getting psychiatric help for her son, Dr. Toler.
Most of the evidence tending to show neglect is hearsay testimony. Although we have concluded that that type evidence is admissible, we feel that much caution should be used in accepting it, and that it should be considered with the facts established by direct evidence to determine whether the latter tend to corroborate or discredit the hearsay testimony. We have examined all of the evidence presented with that in mind.
The fact that a shot was fired by Dr. Toler on the night of February 6, 1972, was established by Dr. Toler’s own admission. We are convinced that the doctor did not shoot at his son, but we also believe the boy’s statement, which appears in the record by hearsay testimony, that he thought his father had shot at him, and that he feared that he was in danger.
There is direct testimony to the effect that Dr. Toler told Olivier that he did not “give a damn about the boys, and that he did not want them back at home.” Ordinarily we would be inclined to reject a statement of that kind by a parent. The evidence in this case, however, tends to show that the doctor actually had little concern for at least one of his sons. When the judge and two deputies arrived at Toler’s home on the night of February 6, about four hours after the shot was fired, they found Dr. Toler lying on a *664 couch in the kitchen, apparently unconcerned over the fact that the boy had run away from the premises following the firing of the pistol, and that he had not returned by midnight. The evidence indicates that Toler made no attempt to search for his son, or to contact him and dispell the fear which he knew the boy must have experienced following the firing of the pistol.
The testimony that Dr. Toler had brandished a pistol on another occasion about four weeks before the trial, when Frankie's sister warned him to run for his life, is hearsay. But it is corroborated to some extent by the established fact that the doctor had a pistol, and that he did not hesitate to use it about three weeks later when a disciplinary problem arose with Frankie.
The testimony that respondent struck his mother and stomped on her glasses in the presence of the children also is hearsay, but it is supported by the direct testimony of Olivier that he saw the broken glasses on the floor at the time the mother, Mrs. Toler, related the incident to him.
Dr. Toler concedes that at least some of his children ran away frequently when he attempted to discipline them, and that on some occasions they remained away from home as much as two or three days at a time before returning. He stated that they usually stayed at the Olivier home during those periods. The evidence also shows that it had been necessary to call the police or other law enforcement officers to the Toler home occasionally because of disciplinary or other problems. Mrs. Toler testified that she and respondent had given three policemen a bottle of liquor for Christmas “because they helped me with Frankie last year so much, all of them did, you know, I had to call them to come help me out with Frankie.”
Dr. Toler concedes that he has had some trouble disciplining the children, but he attributes some of this trouble to the fact that Olivier allows the children to seek refuge in his home. He stated that prior to February 6, 1972, he asked Olivier to discontinue taking the children in when they go to that home to avoid discipline by the father. He confirmed the hearsay testimony of Olivier that the boys had spent the night in an automobile on one occasion shortly before custody was removed from the father, but he explained that they did that voluntarily, that they had blankets and they had access to and from the house, and that the father slept on a cot in the house just a few feet from the automobile. We note that the doctor also testified, however, that he keeps ice cream for himself because of a gall bladder condition, that his sons had eaten all of the ice cream in the home freezer on that date, that he usually fusses when he goes to the refrigerator and finds nothing left in it, and that the boys “didn’t want to come in for fear I might discover that.”
With reference to the firing of the pistol, the doctor explained that he did not shoot at his son. He stated that he had been ill and had been taking some medicine that day which caused him to feel “rocky,” that the misbehavior of young Frankie was “upsetting” him, and that he fired the pistol solely because he thought the noise would make Frankie come to the house. He denied Frankie’s reported statement that he tied the boy to a tree and fed him dog food on one occasion, or that the children ever went hungry. We find no support for either of those charges against respondent, and we accept Dr. Toler’s statements that neither assertion is true. He explained that the unkept condition of his home on February 6 was due to the fact that Mrs. Toler was not there that day, that he was ill and that the housekeeper had quit working for him a few weeks before that date. With that explanation, we attach no significance to the disorderly condition of the home. The doctor emphasized very strongly that he loved all six of his children, and that he wants the custody of those children returned to him.
The testimony of other witnesses called by respondent supports his statements gen *665 erally that he loves his children and that they are well cared for and are properly fed. Mrs. Alice Toler denies that her son struck her, or that she ever sought psychiatric help for him.
The trial judge obviously accepted much of the testimony of Charles Olivier as to respondent’s actions since judgment was rendered removing the custody of all six children from the father. The judge made no finding of “unworthiness” on the part of Dr. Toler. He observed in a sworn statement appearing in the record that he removed the custody of the children from the father solely as a temporary measure, that he feels that the conditions which warranted the removal of custody can be remedied, and that custody can be restored to Dr. Toler when there has been a change in circumstances.
We think the trial judge felt that the safety and welfare of the children would be endangered by returning them to the custody of their father. In the original order issued on February 7, 1972, for instance, he stated that “the court feels that it should take protective custody over all of the children.” In the second order issued on February 11, he noted that he had visited the Toler home in the middle of the night “because of concern that the father’s condition had become dangerous,” and that' he “prevailed on him to remove himself from the home for the remainder of the night.” And, in the judgment appealed from, rendered on February 16, the trial judge again noted that the children “are in need of protection of the State.” We think the evidence warrants this concern on the part of the trial court.
In cases involving the custody of children a great deal of discretion is accorded to the trial judge, and his decision will not be reversed on appeal except in the clearest case of abuse of such discretion. In re State ex rel. Thaxton, 220 So.2d 184 (La. App. 1 Cir. 1969).
The evidence convinces us that the respondent used a pistol on two occasions as a threat or as a means of enforcing discipline on his children, and that he fired the pistol on one such occasion. We find that he used violence toward his mother, and that he failed to provide proper care, love and concern for his son, Frankie, following the shooting which occurred on February 6, 1972. After carefully reviewing all of the evidence, and considering the fact that the trial judge visited in the home of Dr. Toler twice recently and has had an opportunity to observe him, we have concluded that the judgment appealed from must be affirmed.
We are aware of the seeming harshness of a judgment which removes the custody of a child from his parent. In cases involving the custody of children, however, the primary concern of the court is the welfare and best interest of the children. In re State ex rel. Thoman, supra. We have concluded that the welfare and best interest of the Toler children will be served by removing them, at least temporarily, from the custody of respondent.
The judgment of the trial court indicates that with a change in circumstances the children may be restored to the custody of their father. We think it is appropriate to observe that a judgment awarding custody of children is always subject to modification. In the event a change of circumstances occurs, therefore, Dr. Toler will have the right to seek a modification of the judgment appealed from.
We find no merit to respondent’s argument that the judgment of the trial court is void because of a failure to observe some of the procedures prescribed in LSA-R.S. 13:1561-1599. A formal petition, as described in LSA-R.S. 13:1574, was not filed in this proceeding. That section provides that “the court may make such informal adjustment as is practicable without a petitioner, or may authorize a petition to be filed by any person.” This provision is somewhat ambiguous, but we do not interpret it as requiring a petition in a neglect proceeding. Here, the record *666 is complete except for a petition, and we think that there has been an adequate compliance with the statute.
LSA-R.S. 13:1574 also provides that “In the trial of a child under R.S. 13:1561 through R.S. 13:1592 it shall be the duty of the district attorney to conduct the prosecution.” Respondent argues that the judgment appealed from is void because the district attorney did not represent the state in this case. There is no merit to that argument. A neglect procedure, such as this, is not the “trial of a child,” and there is no “prosecution” to be conducted by the district attorney. Even if the statute should be held to mean that the district attorney has a duty to represent the State, we do not feel that his failure to do so would nullify the proceedings.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.