263 So.2d 888

In re STATE of Louisiana In the Interest
of Francezica M. TOLER et al.

No. 52494.

June 20, 1972.

Concurring Opinion June 30, 1972.

Jacque B. Pucheu, Eunice, Felix A. De-Jean, III, Opelousas, Milton E. Brener, New Orleans, for applicant.

Lucas S. Conner, Jr., Baton Rouge, for respondent.

McCALEB, Chief Justice.

In this matter one of the judges of the Twenty-Seventh Judicial District Court, sitting as a Juvenile Court, rendered a judgment which decreed that the six minor children (three boys 12, 8 and 6 years old, and three girls 14, 10 and 4) of Dr. William F. Toler are neglected children within the purview of R.S. 13:1561–1580 and in need of the protection of the State. He, therefore, awarded the care and custody of the children to the Louisiana Department of Public Welfare.

The judgment was affirmed on appeal by a two to one decision. 261 So.2d 659. We granted certiorari, 262 La. 127, 262 So.2d 393.

Dr. Toler is a dentist and practices in Opelousas, St. Landry Parish. He lives with six of his seven children (the eldest is married) in a large, comfortable home near Washington, a few miles north of Opelousas. His first wife, the mother of the children, is dead. A second marriage terminated in divorce.

The circumstances leading up to the rendition of the judgment removing the children from the custody of their father are as follows:

On Sunday evening, February 6, 1972, Dr. Toler's twelve year old son, Frankie, refused to come into the house or to stop throwing rocks at the side of the building when told to do so by his father. Dr. Toler then got a pistol and went outside with it, at which time the boy was nowhere in sight. He fired the pistol into the air, the bullet striking the ceiling of the carport. At the hearing Dr. Toler testified that he fired the pistol in the hope that the boy would come back to see what made the noise. Instead, Frankie went to the home of Charles Olivier, a neighbor and friend of the family who lived about a mile away, and with whom the boy had previously lived for several months while Dr. Toler was away at a dental school in Alabama for specialized training.[1] Frankie reported to Olivier that his father had shot at him. (It is now conceded that his father had no such intention but that, as shown by his uncontradicted testimony and other evidence, he fired into the air in an effort to attract the boy's attention.)

Olivier telephoned the sheriff and one of the district court judges. Whereupon, the judge accompanied by two or three sheriff's deputies went to the Olivier home,

---

1. During this time the other children remained in the home with their grandmother, Dr. Toler's mother.

and talked to the boy who related his same story to them. They then went to Dr. Toler's home. After a discussion, all of the children, with the consent of Dr. Toler, were placed for the night with Olivier. The next day (February 7), following a conference with Dr. Toler, the trial judge signed an order, consented to by Toler, taking the children into protective custody and granting the temporary care and immediate physical possession of the three boys to Olivier, and the temporary care and immediate physical possession of the three girls to Dr. Toler, pending further action by the court. The girls were returned to their home.

On the night of Thursday, February 10, 1972, when the older girl (Frannie), who is about fourteen years old, was instructed by her father to take a bath she left the house. This was reported to the authorities. At about one o'clock in the morning, the judge again went with the deputy sheriff to the Toler home. At that time the children's grandmother was at the house. The girls were permitted to remain at home with the grandmother, and the father was prevailed upon (under threat of arrest) to leave the home and spend the remainder of the night at the police station. Later that morning (February 11), the judge signed an order revoking his pre-

vious order of detentive care, and placing the temporary detentive care of all of the Toler children in the State Department of Welfare, which agency, we understand, has taken physical possession of the children, thus removing them from their father's custody and control.

■ No written petition was ever filed. But on February 11, 1972, after the second temporary order of custody had been signed, a hearing was held concerning the matter of the children's custody. It was continued until February 15, 1972, at which time Dr. Toler was represented by counsel, but no representative of the State appeared at the hearing. The judge, who had already personally investigated the matter, conducted the proceedings, apparently in behalf of the State, calling witnesses (whose opinion evidence, based primarily on hearsay, tended to show the unfitness of Dr. Toler to retain custody of his children), and conducting the cross-examination of Dr. Toler's witnesses. He was also sworn as a witness and gave testimony as to occurrences in his presence and he gave his opinion of the situation at the Toler home. Thereafter, he rendered a final judgment declaring the juveniles to be neglected children within the purview of R.S. 13:1561–1580 and awarded their care and custody to the Department of Welfare.[2]

---

2. This judgment was "final", of course, only in the sense that it was an ultimate, appealable judgment of the district court.

We do not mean by this language to vary from the well-established jurisprudence that custody judgments, unlike

In affirming the judgment of the lower court, the Court of Appeal majority dismissed the argument of Dr. Toler that the judgment was invalid because it was not based on any formal written petition as described in R.S. 13:1574, with the observation that "This provision is somewhat ambiguous, but we do not interpret it as requiring a petition in a neglect proceeding."

We disagree with this conclusion, as well as the Court's holding on the facts.

R.S. 13:1574 recites that:

"Whenever any person informs the court that a child is within the purview of R.S. 13:1561 through 13:1592, the court shall make a preliminary inquiry to determine whether the interests of the public or of the child require that further action be taken. Thereupon the court may make such *informal adjustment* as is practicable within a petition, *or may authorize a petition to be filed* by any person. The proceeding shall be entitled 'The State of Louisiana in the interest of ————, a child under seventeen years of age.'

"The *petition* shall be verified and, if made by a probation officer or the district attorney, may be upon information and belief. It shall set forth plainly (1) the facts which bring the child in the

purview of R.S. 13:1561 through 13:1592; (2) the name, age, and residence of the child; (3) the names and residences of his parents; (4) of the person or persons having custody or care of the child and (5) of the nearest known relative if no parent, custodian or other person having the care of the child can be found. If any of the facts herein required are not known by the petitioner the petitioner shall so state.

"In the trial of a child under R.S. 13:1561 through R.S. 13:1592 it shall be the duty of the district attorney to conduct the prosecution."

R.S. 13:1575 provides:

"*After a petition shall have been filed* and after such further investigation as the court may direct, unless the parties hereinafter named shall voluntarily appear, the court shall issue a summons reciting briefly the substance of the petition and requiring the person or persons who have the custody or care of the child to appear personally and if necessary bring the child before the court at a time and place stated. * * *

"If it appears that the child is in such condition or surroundings that his welfare requires that immediate action be taken for his protection, the judge may order that a probation officer or any

---

other ordinary judgments, are never "final" in the sense that they are always subject to review and modification by the courts, particularly when circumstances change.

other authorized agent of the court shall at once take the child into detention."

R.S. 13:1579.1 states:

"In the hearing of all cases under this Part, *involving petitions* of juvenile delinquency or *neglect,* all facts connected therewith and all surrounding circumstances, including the environment and history of the child, together with any character of evidence, including hearsay evidence and opinion evidence which the court, in its discretion, may deem proper, may be admissible, and the testimony of the probation officer assigned to the case shall be admissible." (All italics ours)

And R.S. 13:1580 makes provisions for the type of judgment which may be entered if the court finds that the child is neglected, delinquent or otherwise in need of the protection of the State.

■ Reading all of these sections together, it is clear to us that in such cases as this one the court, where the immediacy of the situation requires prompt action for the protection of the child, is authorized, without any formal petition, to make "an informal adjustment", so far as is practicable. That is, the child may, be taken at once into detention or protective custody. This, we think, is what the court did on the nights February 6 and 10, 1972 when it

immediately removed the children from the care and custody of Dr. Toler.

■ However, all of the other provisions contemplate an adversary proceeding like any other lawsuit, i. e., the *necessity of the filing of a formal petition* before the court can *hear* and *decide* the question of whether the minor is neglected or delinquent and issue a custody order for an indefinite period in accordance with R.S. 13:1579.1. Such a petition setting forth the ages of the child or children, the facts which bring it or them within the purview of R.S. 13:1561–1592, and so on, is the foundation of the proceeding to determine the issue of neglect or delinquency. And any proceeding conducted in its absence, as was the instant one, is null and can have no legal effect.

The record before us reveals that, over the objection of counsel for Dr. Toler, hearsay testimony was admitted into evidence to establish the need for a change in custody.[3] In fact, as we have already indicated and as the Court of Appeal majority opinion shows, virtually the entire case against Dr. Toler (with the exception of his having admitted the shooting of the pistol to attract the attention of his child, which act we do not necessarily condone, but which alone is not sufficient in our judgment to deprive him of the custody of

---

3. In at least one instance, "once-removed" hearsay was permitted. Thus, Olivier was allowed to testify as to what his wife told him that Frankie had told her.

his children) consisted of hearsay testimony. We get the impression from the testimony of the juvenile court judge that he had some doubts as to the mental stability of Dr. Toler. However, this seems to have been based entirely on his encounter with Toler at the time he went to the Toler home to remove the girls at about one or one-thirty in the morning, after the oldest girl left home. But it is understandable that the father would have been upset under these circumstances. No medical evidence tending to establish mental instability of Dr. Toler was introduced. To the contrary, the only medical evidence (which was offered by Toler) negatives such a conclusion. Likewise, persons who had lived and worked in the home also gave testimony which contradicts the suggestion of a mental problem.

Although Olivier was permitted to testify at length as to what the children had told him about what went on at home, much of which was denied by Dr. Toler, none of the children was called to establish directly their versions of the occurrences, or their mental attitude toward their father.

On the other hand, there is uncontradicted testimony that the home which Dr. Toler has provided is more than suitable for the needs of the family. The children are well fed and healthy. There is apparently some friction developing between Toler and his twelve year old son, Frankie, and,

perhaps with the fourteen year old girl, "Frannie". We find nothing unusual about that situation, since it is common knowledge that disagreements between parent and child begin to develop in many, if not most, families when children reach these ages.

■ Because there is no reliable, direct evidence on which to base a conclusion that the children are neglected within the provisions of R.S. 13:1569(8) and 1570, Sub-section A, paragraphs (1) and (2) we have determined that the Toler children should be returned to the custody of their father as of the date of the rendition of this judgment, pending its becoming final, rather than when it becomes final, and shall so decree.

In oral argument to this Court and in brief, counsel for Dr. Toler also urges that R.S. 13:1570.1 is unconstitutional insofar as it permits hearsay evidence to be introduced solely at the discretion of the trial court.

■ We deem it unnecessary to pass on this issue inasmuch as we have already decided the case in Dr. Toler's favor on other grounds. Under these circumstances this Court will adhere to its long-established policy of refraining from passing on the constitutionality of a statute unless it is necessary for a determination of rights of a litigant in the case before it. Aucoin v. Dunn, 255 La. 823, 233 So.2d 530 (1970),

and the many authorities cited therein. This is also the rule of the United States Supreme Court. See Alexander v. Louisiana and cases there cited. 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972).

For the reasons assigned the decree of the juvenile court placing custody of the minors, Francezica M. Toler, William F. Toler, II, Robin Toler, Thomas W. Toler, Theodore M. Toler and Johnice Toler, in the custody of the State Department of Welfare, and the judgment of the Court of Appeal affirming it, are reversed and set aside. It is now ordered that the said minors be returned to the custody of their father, Dr. William F. Toler, immediately upon the rendition of this judgment, it being the intent of this Court that Dr. Toler retain custody of the minors pending the finality of these proceedings

BARHAM, Justice (concurring).

We granted this writ because there was a conflict in the jurisprudence between the Second Circuit Court of Appeal and the Third Circuit Court of Appeal. The Second Circuit Court of Appeal in In Re State in Interest of Elliott, 206 So.2d 802 (1968), declared R.S. 13:1579.1 unconstitutional insofar as it permitted " * * * any character of evidence, including hearsay evidence and opinion evidence which the court, *in its discretion, may deem proper * * * *"*. (Emphasis supplied.) Whether

a juvenile court proceeding involves the possible custodial care of a juvenile in a state quasi-penal institution is immaterial in determining the application of this statute. In my opinion In Re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), cannot be distinguished on the basis that it applies only to a case involving commitment of a juvenile "to an institution in which his freedom is curtailed". Every hearing involving the custody of a juvenile is a hearing in which that child's future freedom is threatened. It is also a hearing at which fundamental parental rights may be threatened. The basic objection to hearsay testimony is that it contravenes the constitutional right to confront those who accuse or testify against a party. If hearsay testimony is to be admitted in juvenile hearings, a safeguard for the protection of this constitutional right of confrontation should be included. At least the names of those from whom the hearsay evidence has been acquired should be divulged to the party at interest so that if he desires, they may be subpoenaed into the juvenile court hearing for confrontation. In the absence of such a safeguard, a provision which gives to the court the vast discretion of admitting any character of evidence, including hearsay, is a denial of due process. The ills which such a statutory provision visits upon the parties appearing in these courts are apparent from the case before us.

I am of the opinion that the Second Circuit Court of Appeal in Elliott correctly viewed the statutory provision, and that the Third Circuit was in error in its holding in the instant case. I also believe that although the majority opinion can stand upon the factual determination made, we are as a court remiss in our duty to settle the law when there are differences of opinion between the appellate courts.

For these reasons I respectfully concur.