BOUTALL, Judge.
This is an appeal from a judgment of the Juvenile Court for the Parish of Jefferson, declaring Coby Allen King, Allison Beth King, Lisa Robin King and Daniel Seth King to be neglected children and awarding custody of the said neglected children to their father, Frederic King, pending further orders of the court. From this judgment, an appeal was taken by Mrs. Stephanie Wallace King, the children’s mother, who had custody of the children during the period of alleged neglect. There are two issues posed on this appeal: (1) that the Juvenile Court for the Parish of Jefferson did not have jurisdiction to entertain this- matter and (2) that the judgment of neglect was erroneous upon the facts shown. We shall take up these matters in turn.
*550 JURISDICTION OF THE JUVENILE COURT.
The general facts are these. Mrs. Stephanie King brought a divorce action against her husband Frederic King in New York, where the parties then lived, in the matter entitled Setphanie King v. Frederic King, Index No. 35297/1971 in the Supreme Court of the State of New York, County of New York, and in that proceeding she was awarded, among other things, an order for custody of the minor children, alimony and support pendente lite, dated February 25, 1972. In this order Frederic King was granted visitation rights. Mr. King later moved to the Parish of Jefferson, State of Louisiana, where he is presently domiciled. In the exercise of his visitation rights, Mr. King visited his children in New York during the weekend of October 5, 1973, visiting with the children that Friday, but on the following day, without the knowledge of their mother, he picked up the children and flew with them to Jefferson Parish. Mr. King asserts that he intended to return with the children the next day, but after talking to the children he concluded that they had been subjected to such poor treatment by their mother, that to insure their well-being it was necessary to have them examined by knowledgeable, expert persons who could advise him whether the welfare of the children was imperiled. Accordingly he sought medical and psychiatric advice, as well as an examination by the Probation Department of the Juvenile Court, and based upon these findings he concluded that the welfare of the children demanded that he keep them with him in Jefferson Parish.
As a result of these examinations, report was made to the Juvenile Court for the Parish of Jefferson that the children were neglected children, and accordingly a petition was filed on October 9, 1973 in that court in the interest of the four children, the petition being signed by Milo Fauster-mann, Juvenile Probation Officer of that court. The inquiry showed, and the evidence presented on the trial bore out, that all of the acts complained of took place while the children were in the custody of their mother in New York. Upon the filing of the petition, considering the reports to him, the court rendered an order declaring that an emergency exists and the children should be placed in the temporary custody of their father.
In attacking the jurisdiction of the court, Mrs. King urges to us that she was domiciled in New York and had custody of the children under the New York order; that whatever activity took place, it took place in New York wherein she and the children were domiciled, and that any inquiry into these facts could only be conducted by the New York Court. In partial support of this contention, appellant relies upon the recent case of Smith v. Ford, 288 So.2d 71 (La.App. 4th Cir. 1974) which holds that the jurisdiction conferred upon the district court in Louisiana Code of Civil Procedure Article 10(5) can only be exercised when some acute emergency obliges the state to intervene for the immediate necessities of the child’s welfare, in what is ordinarily the province of the state of the child’s domicile. Although we note that there is some general similarity in facts in that case and this case, we do not believe that case to be appropriate to this appeal, and we specifically make no comment herein as to the holding. Suffice it to say that the court of inquiry was the district court in the Smith case, and the question before the court was solely one of custody. In this case, we have an inquiry in the Juvenile Court concerning neglect of children, which is an entirely different matter.
The jurisdiction for a neglect hearing in the Juvenile Court is set out in LSA-R.S. 13:1570 A (1 and 2) as follows:
§ 1570 Jurisdiction
“Except as otherwise provided herein, the court shall have exclusive original jurisdiction in proceedings:
“A. Concerning any child whose domicile is within the parish or who is found within the parish:
“(1) Whose parent or other person legally responsible for the care and sup *551 port of such child neglects or refuses, when able to do so, to provide proper or necessary support, education as required by law, or medical, surgical or other care necessary for his wellbeing; or who is abandoned by his parent or other custodian; or who is otherwise without proper care, custody or support; or who is a live born human being, as defined in R.S. 13:1569(16) (e), who survives and is not killed in an abortion attempt.
“(2) Whose occupation, behavior, environment or associations are injurious to his welfare.”
The distinction between the jurisdiction of the district court to decide custody and the jurisdiction of the Juvenile Court to determine whether children are neglected children, thus placing at issue custody, is clearly shown in the case of In re Owen, 170 La. 255, 127 So. 619 (1930), wherein the Supreme Court discussed a history of the prior jurisprudence and the prior statutory law. The court stated:
“[3] The line of demarcation between the courts exercising general civil jurisdiction with respect to the care, custody, and control of minors and the juvenile courts is well defined. These courts, in dealing with the welfare and interest of minors under a given age, are entirely independent of each other. Where the contest is between the parents, or between a parent and a third person, as to who should have the control and care of the minor, the court exercising general civil jurisdiction is the proper and exclusive tribunal to decide the issue.
“[4] But, where a child is neglected or delinquent, and where the parent contributes to, or is responsible for, such neglect or delinquency, then the state has the paramount right in the interest of the welfare of the child to say who shall have the care, custody and control of the child, and the juvenile court has been made the special and exclusive tribunal for determining such issue.
“[5] There is no force in the contention that this is not a proceeding by the state. It’ is true that the proceeding was initiated by the affidavit of individuals, but the charge as stated is quasi criminal, and it was made on behalf and in the interest of the state in the proper exercise of its paramount right to determine the best interest and welfare of the children in the manner provided by law.” 127 So. 622.
The rationale of the above quotation has been reiterated in numerous cases. See In re Cruse, 203 So.2d 893 (La.App. 4th Cir. 1967).
Addressing ourselves now to the question of whether this particular Juvenile Court could entertain the petition, we note in R.S. 13:1570 that the court has jurisdiction over any child who is found within the parish or whose domicile is within the parish. This is further clarified in § F of the Statute which declares that the policy of the State is that the child should be presented to, and his case heard in the court of his domicile regardless of the parish in which such act is committed or such other conditions exist. However the act further provides that this shall not be construed to deprive the court of any parish of jurisdiction if the child or his parent is at the time the conditions exist present in the parish. A reading of this section would indicate the possibility that no provision has been made for a case such as this wherein the child is found within the parish, but the act or condition has existed outside of the state. This omission is explained by reference to R.S. 13:1571.5, which was brought into being by Act 140 of 1972, which grants the Juvenile Court the discretion to transfer the hearing to the courts of another state wherein the minor may be domiciled or may later become domiciled, if such court would accept jurisdiction. Thus, as we interpret the statute, when a child in this state is sought to be declared a neglected child, the Juvenile Court of the parish in which the child is found may either accept jurisdic *552 tion and itself try the matter, or may decide to transfer it to the state of the minor’s domicile if acceptance is obtained. The Juvenile Court of Jefferson, having decided to make the inquiry itself, must then make a finding of neglect in order to sustain its jurisdiction. See State In Interest of Toler, 262 La. 557, 263 So.2d 888 (1972). Also In re Rome, 251 So.2d 435 (La.App. 1st Cir. 1971). 'This is true even when the mother has been previously granted the temporary custody of the children in a proceeding of separation from bed and board or divorce in the district court. State v. Tomasella, 200 La. 60, 7 So.2d 615 (1942).
ON THE MERITS.
The Juvenile Court is a court devoted to the furtherance of the welfare of children, and the primary concern in child neglect cases is the welfare and best interest of children. In the case of In re State ex rel. Thaxton, 220 So.2d 184 (La. App. 1st Cir. 1969), the court stated that the burden of proving that a parent is unfit or incapable of caring for a child rests with the state who has in fact and in law interceded in the affairs of the parent for the sake and in the interest of the child. In cases involving the custody of children a great deal of discretion is accorded to the trial judge and his decision will not be reversed on appeal except in the clearest case of abuse of such discretion. With these principles in mind we proceed to examine the evidence presented herein.
The testimony of Mr. King is that in 1972 he moved from New York to the New Orleans area where he had obtained the position of Assistant Vice-President for Health Affairs at the Tulane Medical Center. In Thanksgiving of that year he brought his children to visit with him over the Thanksgiving holidays under the weekend visitation right granted by the New York court. On July 31, 1973 he again brought the children down to visit with him at his home in Metairie, Jefferson Parish for two weeks pursuant to the summer visitation rights granted, him. At the end of these two weeks, the children refused to return to their mother’s home. After some discussion with his wife about the matter he kept the children here, enrolled them in the public schools until September 14, 1973, at which time Mrs. King and her mother came to Louisiana and tried to take the children back to New York. However at the airport the oldest child, Coby, managed to escape. After seeking legal advice, Mr. King turned the child over to his mother to return to New York.
On October 6, 1973, King again exercised his weekend visitation right and decided to bring his children to his home in Metairie in order to spend the Yom Kippur religious holiday with them. He had round trip tickets to return the children to New York the next day and intended to do so but the children refused to return to their mother’s home because of the treatment they claimed they had been afforded by their mother. King then sought the consultation and’ counsel of Dr. Richard Brunstetter, a medical doctor and psychiatrist who is Director of Child Psychiatry at Tulane Medical School. He also had the children interviewed by Walter Rothschild, a juvenile probation officer attached to the Juvenile Court for the Parish of Jefferson. Based upon what the children told him and the results of this examination, he decided that the children needed his immediate protection for their welfare.
The bulk of the evidence concerning the treatment of the children is furnished by the children themselves, and we set it out herein in detail. There is of course some variance in the testimony of the children but basically they tell the same story. Indeed, it appears that the children had discussed this matter to considerable extent so that their testimony, for the most part, was quite similar. One of their biggest objections is that their mother was living for some time with a man named Beck, and then, since January 1973 with a man *553 named Ronnie Jacoby. This latter relationship seems to be the major source of trouble between them.
In summary, they testify as follows. The mother was seldom home in the afternoon when the children came home from school. She came home at dinner time with Jacoby. The children testified that their mother and Jacoby daily drank alcoholic beverages. The children testified that they were subjected to gross profanity by Jacoby and their mother. Jacoby, the children testified, called the two eleven year old girls “you fucking bitches,” among other profanities. Jacoby was described as being violent, and as physically striking and abusing the children. Jacoby, according to the testimony, on one occasion, during an argument, threw an object at the mother, missing her and breaking the wall, after which he smashed a door so hard the glass broke. He also had punched a hole in the wall through a heart containing the words, Ron loves Steph.
The children testified that their mother hit them almost daily for failing to eat their dinner fast enough. They were for the most part struck with her sandal, but also with her hand.
The girls testified that on one occasion one of them, after discovering a listening device attached to the phone by their mother, broke it accidentally and so informed her mother. The mother, in response, struck the girl across the face, splitting her lip. She then put the girls out of the house in the rain and left them there for several hours.
Allison testified that Jacoby kissed her on the lips, although she tried to avoid him. She stated she would wipe her mouth afterward.
There was testimony that on one occasion the mother took the children to Dennis Beck’s apartment, where people were drinking and gambling. A man there pushed Lisa against a chair bruising her face, but drawing no response or action by the mother.
The children’s testimony showed a general pattern of lack of care by the mother for the children. In the mornings, the mother was in bed with Jacoby. The children had no breakfast, and made lunches for themselves, which they took to school. When the children came home from school, there was no one at home. The mother was not employed.
On one occasion, one of the children, home alone after school, suffered an allergic reaction to a bee or yellowjacket bite. The child had the presence of mind to go to the house of a neighbor, who obtained medical assistance.
At dinner time the mother came home with Jacoby. The children expressed resentment that the mother and Jacoby ate gourmet foods, steak and lobster, while the children were given inexpensive foods. There wa8s testimony concerning abuse by Jacoby when the children unwittingly helped themselves to fruit he purchased for his own consumption. After dinner, the girls had to do the dishes from the children’s dinner, as well as Jacoby and their mother’s, who ate separately. The mother never assisted them.
On Friday and Saturday evenings, the children were left home alone while the mother and Jacoby went out. The children testified to being home sick from school, in some instances under a doctor’s care and on medication, and that their mother left them home alone when they were sick and she went bowling.
The children testified about an absence of maternal direction regarding personal cleanliness, Lisa stating that she just took a shower when she smelled so bad she had to.
We have set out the testimony with this detail because the mother has produced testimony of herself and her mother, Mrs. Ann Wallace, which denies in large part *554 most of the incidents and particularly the relationship between Jacoby and Mrs. King, and insists that some of the items of which the children complain are either isolated incidents or completely exaggerated by the children. We agree that a number of the things mentioned above and complained of by the children are not really grounds for depriving the mother of the custody of her children. However the question of the relationship of Mrs. King and Jacoby is of the utmost importance in this matter, and there is a sharp conflict between the testimony of the children and that of their mother. The trial court did not give reasons for its judgment, but it did declare the children to be neglected within the purview of the juvenile law, and we must assume that the question of credibility was resolved in favor of the children.
The record discloses that the children were examined by Dr. William Thurman, a pediatrician, who testified that Daniel King had a form of “cradle cap” “attributable to lack of scalp cleanliness, and that Coby had a case of poison oak which had not received necessary medical attention. However, other than this the children were in good health and are not suffering from any child abuse. Considerable support is given the children’s testimony by Dr. Richard Brunstetter, the child psychiatrist, who testified that the three oldest children were desperate in their desire not to have to remain living with their mother. The youngest child, Daniel, missed his mother and feels that he would be happier in New York if his father was living with the family there. The doctor expressed his opinion that the children were having emotional problems as a result of their treatment, but he also felt that the children would not resort to lying to achieve their end, however he does feel that the children’s stories are embellished to some degree.
It is apparent in this case that we are faced with an issue of credibility of the witnesses. The general rule is that the trial judge is in the best position to determine the credibility of the witnesses, that his findings must be accorded great weight, and we may not disturb his finding based on credibility unless it is apparent that he has committed manifest error. An examination of this record discloses no such manifest error. Considering then, that the testimony of the children is basically true, we cannot find that he has abused the discretion granted him in the determination of whether these children are neglected children under the statute and in determining that their best interest and welfare is to be placed in the custody of their father pending further orders of the Juvenile Court. Finding no error in the court’s judgment, we must affirm it.
Accordingly, for the reasons above stated, we are of the opinion that the judgment appealed from is affirmed at appellant’s costs.
Affirmed.
SCHOTT, J., dissents with written reasons.