O’NIELL, J.
This is a habeas corpus proceeding whereby the relator is seeking to regain possession of two of her children, a daughter 16 and a son 13 years of age.
The children are in the custody of two of the defendants, Albert R. Nichols and his wife, she being a sister of the deceased father of the children.
In their answer to the suit the respondents alleged that the relator was insane, had no home, nor means with which to support the children, and that their physical and *61 mental welfare would be' seriously endangered by an association with their mother.
The district judge, being of the opinion that the relator was not of sound mind, rejected her demand; and she has appealed.
The evidence of her industry and sufficient earning capacity to support herself and her children was so convincing that the learned counsel for the appellees concede now that the only question to be decided by this court is whether the relator is of such composed mind as to be entitled to the possession and care of her children.
The record reveals a pathetic story. The relator has two other little girls, Katie, 10 years of age, and Helen, 8 years of age. Soon after her marriage she and her husband moved to Atlanta, Ga., and established their residence there. He fell sick in the latter part of 1911 or early part of 1912, and was an invalid several months, during which time she had to nurse him, and had great trouble maintaining the family. He became so despondent that in May, 1912, he committed suicide, leaving the widow and children almost penniless. By hard work and close economy she managed to support herself and her children until December, 1912, when hex-grief and responsibilities had so preyed upon her mind that she became demented. On the petition of her sister’s husband she was adjudged insane by the court of ordinary of Eulton county, Ga., and was committed to the state sanitarium for the insane at Milledgeville, in that state, on the 27th of December, 1912. There is evidence to the effect-that her ailment was only melancholia; but the commitment declared merely that she was a person of unsound mind and shffuíí be committed to the Georgia state sanitarium until restored to her right reason and sound min'd. The two younger children, Katie and Helen, were taken by a sister of their deceased father to Washington county, Miss., and were given a comfortable home there. The other two children, Rebecca and John, were brought by the respondents to the home of Mr. and Mrs. Nichols, on a farm about five miles from Tallulah, in Madison parish, where they have a comfortable and happy home.
After ten months’ treatment in the sánitarium at Milledgeville the relator was pronounced cured, restored to her right reason and sound judgment, and was discharged from the institution by the authorities in charge. She immediately resumed the work in which she had been engaged, selling religious literature. She found employment as a nurse at times, and was for a few months employed as a teacher in a private school. Her great desire was to regain possession of her children and re-establish her home; but the relations who had charge of them doubted that she had recovered entirely from the insanity or that she was financially capable of taking care of the children, and they declined to give them up. She saved hex-earnings, employed an attorney, and in October, 1915, succeeded in having the two younger children, Katie and Helen, returned to her, by habeas corpus proceedings, in Washington county, Miss. Thereafter, she went to Madison parish, La., and attempted to get possession of the other two children, Rebecca and John. On one occasion she telephoned from Tallulah to the farm where the children were living for them to come to town and see her, and, with the aid of friends whom she had brought to assist her, she attempted to take the children forcibly to the train to take them home with her. The children rebelled, and the mayor of the town, with other citizens, came to their rescue, took them from their mother, and returned them to their home on the farm.
In June, 1914, proceedings were instituted in the district court of Madison parish to have the relator interdicted and confined in the state insane asylum at Jackson, La. In accordance with the provisions of Act No. 253 of 1910, the district judge appointed the *63 coroner of the parish and another physician to serve with the judge as a commission to inquire into the question of her sanity or insanity. On the same day on which the commission was appointed the'defendant in the interdiction proceedings, the present relator, filed a plea to the jurisdiction of the district court of Madison parish alleging that she was not a resident of that parish nor a citizen of the state of Louisiana, hut that she was a citizen and resident of the state of Georgia. The plea to the jurisdiction was overruled, the suit for interdiction was tried, and judgment was rendered against the defendant pronouncing her insane and ordering her committed to the East Louisiana Hospital for the Insane at Jackson, La. She appealed from the judgment; and on appeal the judgment of interdiction was annulled, on the ground that the defendant in the suit was a citizen and resident of the state of Georgia, of whom the district court of Madison parish, La., had not jurisdiction to render a judgment of interdiction. See State v. Servier, 136 La. 45, 66 South. 392.
The present habeas corpus suit was filed in the district court of Madison parish in March, 1916. During the preceding three years the relator had been very industrious, and had earned enough money to maintain herself and her two younger children comfortably. She had corresponded regularly with the other two children, sending them numerous articles of clothing and other presents.
There was no testimony of an alienist or specialist on diseases of the mind offered in evidence in this case, or in the interdiction suit. The only physicians who testified in either case were the coroner of the parish of Madison and the other physician who had, with the judge, constituted the commission who had examined into the question of sanity in the interdiction suit. The two doctors admitted in their testimony in this case that they did not consider themselves specialists or experts on diseases of the mind, although the coroner had had occasion to examine a number of persons charged with insanity during the 15 years of his service as coroner. Both physicians expressed the opinion that the relator was insane at the time of the trial of the present suit. The coroner admitted that he had not seen her from the day of the trial of the interdiction suit until he saw her testifying in the present suit, that is, during a period of nearly two years, except that he saw her for a little while on the occasion when he prevented her taking her children home, and in the scuffle in which he forcibly took the child from her she struck him with a stick. He characterized the form of insanity as “moral or emotional insanity,” but admitted that he had never treated a case of moral or emotional insanity, and he gave no reason for his opinion that the relator had. that ailment. The other physician characterized the relator’s alleged mental trouble as a “moral delusional type,” which he said was only another term for moral or emotional insanity. He admitted that he had never seen the relator from the time of the trial of the interdiction suit until he saw her on the witness stand in the trial of this case. He gave no other reason for believing her to be insane than that he had formed that opinion from his observation of her on the witness stand, and by hearing her testify in this suit. He admitted that she had not displayed a mania on any subject, except that she was opposed to the eating of meat, and he said that might be regarded as a fad. He said the greatest scientists and doctors agreed that it was healthy to eat meat, and that the relator might take the idea of furnishing to her children only a certain kind of bread or vegetable, and that she might go so far as to take the wrong steps towards an education or towards a mental or spiritual teaching that might result to the detriment *65 of her children. It is in evidence that the relator is a devout Seventh Day Adventist, whose religious and hygienic teaching and belief is that the human race should not eat meat or flesh food. Vegetarianism is as old as the ancient religion of Hindoostan. It was taught by Plato, Plutarch, and other writers of classical antiquity. It cannot be called a fad or fanaticism at this late day without doing violence to the opinions expressed in the writings of some of the most noted scientists in Europe and America during the last three centuries.
The only witnesses who testified to the insanity of the relator were the two physicians whose testimony is referred to above. A practicing attorney testified that from his acquaintance with the relator and his observations of her he “would not say that she was a proper person to have the custody of these two children, Rebecca and John.” He admitted that his only acquaintance with her consisted of his having met her from time to time within a few months, and he gave no-reason whatever for his unwillingness to say that she was a proper person to have the custody of these two children, Rebecca and John. Two of the respondents, Wm. P. Sevier and Albert R. Nichols, testified to the modest comforts and happiness and welfare of the children in their present place of abode, and related the circumstances undef which the children were taken charge of by them. The children, Rebecca and John, also testified to their welfare and happiness and to the kindness of their adopters; and they expressed their unwillingness to return to their mother.
No proof was offered — no witness testified — that the relator had ever done or' said anything since she was discharged from the asylum in Milledgeville that might be considered evidence of insanity. Our reading of her testimony and that of the witnesses who associated with her and knew her well convinces us that she is not insane.
The record of the interdiction proceedings, which took place nearly two years before the trial of the present suit, was admitted in evidence in this ease over the objection of the relator’s attorney, that it was irrelevant to the issues presented here. Our opinion is that the objection was aimed more at the effect than at the admissibility of the evidence. We have read the record carefully, as part of the evidence in this case, and it does not alter our opinion that the relator is sane.
It is not disputed that the two younger children, Katie and Helen, have had all the care and comfort that any mother’s industry and devotion could- afford her children since the relator has had possession of them.
We are not called upon to decide, as a question of sociology- or of the welfare of the children, whether they are better provided for where they are than they would be with their mother, nor are we to be governed by the preference-expressed by the children, who testified in this case. The minds of children — their likes and dislikes — respond readily to the influence of associations and environment. It is in evidence in this case that, when the relator first visited little Katie, after being released from the Millddgeville asylum, the child put her arms about her mother’s neck and said she loved her, but could not go home with her. When the mother asked why, the child hugged her tighter and said: “You can’t give me auto rides, fine dresses, gold rings, piano lessons, and laces on my clothes.” When the Washington county court gave little Katie and Helen over to their mother, the children wept and created a distressing scene in. the courtroom. The next morning, and thenceforth, they were as happy with their mother as they ever were in their lives. We hope and believe that Rebecca and John can make their lives as happy with their mother as their little sisters are with her. Be that as it may, *67 the question is not whether they will be as happy or as well provided for with their mother as they are now with their foster parents. The only question for us to decide is that of the relator’s rights in the premises. If she is capable of taking care of her children, no one better able to care for them can question her right to have them in her own custody. The tutorship and authority over minor children whose father is dead belongs of right to the surviving mother. R. C. C. 216 and 250; Succession of Reiss, 46 La. Ann. 346, 15 South. 151, 25 L. R. A. 798; Prieto v. St. Alphonsus Convent of Mercy, 52 La. Ann. 631, 27 South. 153, 47 L. R. A. 656. Our conclusion is that the relator is entitled to the relief prayed for.
For the reasons assigned, the judgment appealed from is annulled and reversed, and it is now ordered, adjudged, and decreed that the relator have possession of her children Rebecca and John, and that the respondents pay the costs of this suit.