499 So.2d 697 (1986)
STATE of Louisiana In the Interest of TWO MINOR CHILDREN.
No. 86-91.
Court of Appeal of Louisiana, Third Circuit.
December 10, 1986.
*698 Alfred R. Beresko of Graves, Daye and Bowie, Shreveport, for defendants-appellants.
Don M. Burkett, Many, for plaintiff-appellee.
Before LABORDE, KNOLL, and KING, JJ.
KNOLL, Judge.
The legal guardians (appellants) of two minor girls appeal the judgment of the Eleventh Judicial District Court of Sabine Parish, sitting in its capacity as the juvenile court, removing the two minors from their custody. The names of the litigants have been omitted in the title and in this opinion. Appellants seek the return of custody contending the juvenile court erred: (1) in considering them as foster parents, and that the State failed to prove they were unfit to have custody; (2) in holding that the State proved by a preponderance of the evidence that the children were in need of care and supervision; and (3) in failing to use the least intrusive means to correct the perceived problems in the appellants' home, other than removal of the children. We affirm.

FACTS
This case involves the protection and best interest of two minor girls who were two and three years of age at the time of trial.
In December 1983 the natural parents (who were not married but living together) of the two minor girls were living in Water Town, New York. The oldest child was born May 10, 1982, and the youngest child was born on July 5, 1983. At some point the New York agency in charge of child abuse and neglect initiated actions to determine whether the children should be removed from the custody of their natural parents. The mother was well known to the New York agency. At that time the two children were not living with the parents, but were living with a friend of their mother's, who had six children of her own. The living conditions were very crowded.
A member of the natural mother's family advised the natural mother's brother and his wife, the appellants herein, of the New York agency's plan to place the children in a foster home. Appellants were living in Louisiana. Shortly thereafter, appellants, *699 the natural parents and the New York agency met in New York, and on December 30, 1983, the natural parents signed a notarized document in which they temporarily transferred the custody of the two minor girls to appellants.
Appellants returned to Louisiana with the children and shifted around until the appellant-wife found employment in Many, Louisiana, wherein they settled. The appellant-wife had two children from a previous marriage, a girl and a boy, ages 13 and 16 respectively. In addition appellants had a child of their own who was born on June 12, 1982.
In May 1984 a New York relative of the natural parents contacted the Sabine Parish Office of the Louisiana Department of Health and Human Resources (DHHR) with a complaint that she believed appellants were going to sell the two minor girls.
On May 17, 1984, Mrs. Sarah Pilcher, a Sabine Parish social worker, visited appellants' house. She testified that the porch was cluttered with household items, garbage and dirty diapers. Through the appellant-husband's employment with Robert Gentry, an affluent community leader, Mr. Gentry and his wife, Marsha, became attached to the oldest of the two minor girls staying with appellants, and the girls would often visit the Gentrys at their home. On the date of Mrs. Pilcher's home visit the oldest of the children was visiting at the Gentrys'. Appellants told Mrs. Pilcher that they welcomed the Gentrys' assistance because of the attention these people gave to the child. In the course of the interview appellants denied they intended to sell the two minor girls, although they did admit that the Gentrys exhibited an interest in adopting the oldest one. The Sabine Parish Family Center closed their file on this complaint.
During the summer of 1984 appellants initiated legal action against the natural parents of the children to obtain permanent custody. In basically an uncontested matter tried against the curator ad hoc appointed to represent the non-resident natural parents, the district court awarded appellants the permanent custody of the children. No appeal was taken from this judgment.
On July 24, 1984, Mrs. Janice Jones, a Sabine Parish Health Nurse, contacted Mrs. Pilcher at DHHR out of concern for the children. The appellant-wife told Mrs. Jones during an examination of the children for WIC certification that: (1) she put ear plugs in her ears to shut out the noise of the children while she slept; (2) acknowledged partiality to her own young child; and (3) conveyed the resentment of her two older teenagers for having to care for the two girls while appellants worked. Mrs. Jones further noted that the appellant-wife seemed neglectful and indifferent to the children's needs, and told how the appellant-wife held her hand over the youngest child's mouth to keep her from crying when she was given a shot. DHHR investigated the second complaint, considered it unfounded and again closed the case.
A third complaint was lodged against appellants in February 1985, alleging that: they allowed a three year old child to go outside naked; three young children were left for long periods of time without proper supervision; dirty diapers were thrown outside; and the appellant-husband talked dirty and cursed the children.
Mrs. Pilcher again made a home study, finding evidence of neglect which included: a disorderly home; younger children ran around naked a great deal, and were just "let go" at times; appellant-husband had a temper and cursed on occasions; supervision by the two teenagers at night because appellants worked the same night shift; and the appellant-husband's arrest for fighting at a bar. She further learned that Mr. Gentry testified on behalf of appellants at the custody hearing because appellants agreed to give the girls custody to the Gentrys, but that later appellants changed their minds.
As part of her investigation Mrs. Pilcher interviewed Mrs. Rita Mitchell, a former landlady of appellants, and Mrs. Marian Mitchell, a former neighbor of appellants.
*700 Mrs. Rita Mitchell reported that she evicted appellants because they kept the house filthy. She also said she observed appellants' young children outside in the winter without shoes and socks or clad only in a diaper and shirt. Mrs. Marian Mitchell observed similar neglect, and said the appellant-husband used vulgar language, swore at the young children, and she saw him jerk and slap the youngest girl and then curse her.
Though DHHR thought improvements could be made in appellants' home, it found nothing to indicate any serious risk to the children. Accordingly, because DHHR found some of appellants' conditions improving, no court action was initiated.
On January 1, 1985, a new District Attorney took office and appellants' case history came to his attention. The District Attorney received a 12 page report from DHHR, and supplemented the report through investigation. Based on the DHHR report and new evidence he received, the District Attorney initiated action to declare the two young minor girls in appellants' custody in need of care and supervision.

STANDARD FOR REMOVAL AND SUFFICIENCY OF THE EVIDENCE
Under LSA-C.J.P. Art. 13(13), in pertinent part, a "child in need of supervision" means a child who needs care or rehabilitation because "* * * (e) His ... environment or associations are injurious to his welfare; ..."
Under LSA-C.J.P. Art. 13(14) a "child in need of care" means a child:
"(a) Whose parent inflicts, attempts to inflict, or, as a result of inadequate supervision, allows the infliction or attempted infliction of physical injury or sexual abuse upon the child which seriously endangers the physical, mental or emotional health of the child;
(b) Whose physical, mental or emotional condition is substantially threatened or impaired as a result of the refusal or neglect of his parent to supply the child with necessary food, clothing, shelter, medical care, counseling or education, or as a result of the parent's neglect or imposition of cruel punishment; or
(c) Who is without necessary food, clothing, shelter, medical care, education, or supervision because of abandonment by, or the disappearance or prolonged absence of, his parent, or because of any other reason."
LSA-C.J.P. Art. 13(11) refers to "parents" as:
"[E]ither parent if they are married and living together. If one parent is dead, or if the parents are divorced, legally separated, separated in fact, or unmarried, it means a parent or person having legal or actual custody of the child. If no parent has legal or actual custody, it means the person, institution, agency, or association of persons having legal or actual custody."
The district attorney intervenes on behalf of the State in the adjudication of children in need of supervision and in need of care for the protection of the children. LSA-R.S. 14:403(A), and (G)(9). If the removal petition requests that the children are in need of care or in need of supervision, the State shall prove the allegations of the petition by a preponderance of the evidence. LSA-C.J.P. Art. 73. In matters involving the custody of children a great deal of discretion is given to the juvenile court judge because of his superior opportunity to observe the persons claiming custody and the witnesses who testified at the trial. In Re State Ex Rel. Thaxton, 220 So.2d 184 (La.App. 1st Cir.1969); State v. Department of Public Welfare, 170 So.2d 549 (La.App. 3rd Cir.1965).
At the trial of this matter an issue developed as to whether DHHR has the exclusive right to refer to the juvenile court matters of children in need of care or supervision. The issue arose because the District Attorney initiated the petition for removal without receiving a recommendation for such action from DHHR. In ruling *701 that DHHR did not have exclusive jurisdiction to initiate removal proceedings, the juvenile court judge observed:
"... [M]ore often than not the agency [DHHR] refers mattes [sic] of this nature to the Office of the District Attorney, and, if he is of the opinion that the facts of the case are sufficient, he files a petition in the name of the State of Louisiana. However, the agency (DHHR) does not have exclusive jurisdiction in matters of this nature.
Regardless of whether a matter is referred to the District Attorney by the DHHR, the Sheriff, or a Grand Jury, or a private citizen, the ultimate responsibility for presenting matters to the Court, on behalf of the State, rests with the District Attorney.
It is a matter of the District Attorney determining whether he has sufficient evidence to proceed.
In the case at hand, the DHHR simply does not have the exclusive right to refer matters of this nature to the Court, although its assistance is very important."
Relative to this issue are the broad provisions of R.S. 14:403, an ancillary child abuse/neglect statute, which state in pertinent part that the District Attorney may protect abused and neglected children on behalf of the state by filing a petition in accordance with the Code of Juvenile Procedure. Although in the present case DHHR did not see the need for petitioning the court for removal of custody, under R.S. 14:403 and the general tenets of the Code of Juvenile Procedure the District Attorney was with authority in initiating this proceeding. The juvenile court's ruling on this issue is eminently correct.
Appellants contend that the juvenile court used a lesser standard of proof because they were foster parents and failed to consider them legal guardians who stood in the stead of the natural parents. In particular they argue that the juvenile court treated this matter as a custody case using a standard of what was in the children's best interest instead of finding them unfit to have custody.
Appellants' contention is misplaced. Removal of children from their legal custodians is rooted in the various causes defined in the Code of Juvenile Procedure, i.e., as in the case sub judice in C.J.P. Arts. 13(13) and (14), as well as R.S. 14:403. To warrant removal of children from their legal custodians those general provisions as illuminated by the particularized allegations contained in the removal petition must be proven by a preponderance of the evidence. The focal question is whether the child/children are in need of care or supervision. This inquiry is not decided in a vacuum, and by necessity requires a judicial determination in light of the total custodial environment of the child/children. In the case sub judice the juvenile court judge meticulously examined the entire custodial environment of the children.
At the adjudicatory hearing the juvenile court made the following findings of fact which we incorporate herein:
"This evidence established that [the appellant-husband] has a criminal record, he is profane, vulgar, alcoholic, immoral, has a high and sometimes violent temper, and is abusive to four of the five children in the household, including [the minors whose custody is at issue], in many different ways.
Religious training for the children ... is non-existent.
The evidence established that [the appellant-husband] acknowledged being arrested in New York ten times for crimes including shop lifting, petty larceny and burglary....
As recently as six months before trial he was arrested and charged with disturbing the peace out at the Take Ten Bar, near Many. What happened was that he was drinking beer, playing pool for money, and got into a fight with a man he was playing with. The fight was over money winnings. His stepson, [a] 16 year old, was there too, drinking beer, and also got into the fight.

*702 As recently as a week before trial a 15-year old boy ... had come to the residence to play with [appellant-husband's stepson], and [appellant-husband] flew into a rage, attacked [the 15 year old], jumped on him, got him down and beat on him until [he] managed to get away and run. A number of young people were present when this occurred.

By [appellant-husband's] own testimony, and that of [his 16 year old stepson], [appellant-husband] began regularly, at a time when [the stepson] was 15 years old, to take [him] to bars and lounges with him, where [the 15 year old] drank beer as he pleased, with [appellant-husband's] approval. [The appellant-husband] said, referring to [his stepson], `he has a mind of his own.' Going back to the time when [appellants] first got [the two minor girls, appellant-husband] was working for Mr. Gentry. This was when Mr. and Mrs. Gentry were first attracted to [the two minor girls], particularly [the oldest]. During this time Mr. Gentry also employed a black man named Warren Rice. Warren Rice and [appellant-husband] worked together. Mr. Rice testified that he and [the appellant-husband] socialized together, and went to bars together in Leesville, and drank together, and that [appellant-husband's young stepson] also went to these bars with them a number of times, and drank with them. On at least one occasion [the stepson] went to a lounge in Leesville with them and watched the `go-go' dancers. He said he visited in the family home and that the `whole family' would watch x-rated movies. This included the children. He said [the appellant-husband] frequently cursed [his stepson and stepdaughter], and frequently struck [the stepson]. Common language he directed to these children was to tell them they `were full of s____ to `get your f______ a__ in the house', etc.

He also testified that he and [the appellant-husband] frequently went into ... Many, and shot pool together, and drank beer together on these occasions. [The appellant-husband] would usually drink a quart of beer. [Appellant-husband's young stepson] usually went with them, and [the appellant-husband] would buy beer for [his stepson.]
Mr. Rice also testified that [the appellant-husband] told him that he liked for [the oldest minor child subject of this litigation (a 3 year old)] to go visit with the Gentrys, and that `he hoped something would happen to [her] while with the Gentrys, so he could sue them.'
Mrs. Donna Oxley Clark also testified. She had been a next door neighbor to the [appellants] and largely attributed the break up of her marriage to her husband, Terry Clark, to his association with [the appellant-husband]. She said they drank alcoholic beverages together on a daily basis. She testified that [the minors whose custody is at issue] went about the house naked on a regular basis, winter and summer, and that she had seen the [youngest baby] outside with no clothes on. The children were regularly dirty. She further testified that [the appellant-husband's teenage stepson and stepdaughter] watched x-rated movies with [the appellant-husband], and that [he] habitually directed profanity toward [the teenagers], referring to them as `whores' and `mother f______', when he became angry. She said she did not like [the appellant-husband].

Mrs. Miriam Mitchell, who lived in the community, testified that she had seen the little blonde headed boy and dark haired girl run around outside the house naked, or, on other occasions, only partly dressed. She said she had seen dirty diapers thrown in the yard, and had seen the dog playing with the soiled diapers and then go play with the children. She had also seen garbage out in the yard. She heard [the appellant-husband] curse loudly in the presence of the children, and direct profane language toward the children. *703 She had not only heard him curse [the youngest minor child], but he cursed Mrs. Mitchell's little girl as well. She testified to seeing [the appellant-husband] strike [the youngest child.]

Mrs. Evelyn Hopkins, an employee of the local newspaper, testified that on July 24, she looked out through the window where she was working, and saw [the minors whose custody is at issue] in a parked car, by themselves. After a while she went out there to see about them. The weather was hot. The children were wringing wet. This continued for some time, approximately 30-45 minutes. She started to call the police, but [appellant-husband and his stepson] came out of the door of a nearby pawn shop (which was recently raided...) and came to the car. [The appellant-husband] was carrying his [3 year old] son, ..., in his arms.
Mrs. Hopkins said she had seen [the two minors whose custody is at issue] left like this before in June at another place in town.
Both times they were unattended.
Another lady, Mrs. Barbara Lopez, testified to the same type experience. She too had seen the children, ..., left unattended in a car, and she had gone to see about them. They were crying and upset. She and another lady took the children out of the car and kept them until [the appellant-husband] showed up.
Mrs. Delores Aldredge testified that on one occasion she was in a shopping center, in Many, and saw [the two minors whose custody is at issue], alone, unattended in the [appellants'] vehicle. She knew the children. She went to them, opened the door and hugged them, and went on. She never did see [appellant-husband].
The evidence also established that the children, [whose custody is at issue], were habitually either unsupervised or improperly supervised. [Appellants] work during the same work hours, at night, mostly. During the times they are at work the children are left with [the two teenage children].
Mrs. Rose Strickland, a registered nurse, employed by the Sabine Parish Health Center, testified that she had seen [the two minors whose custody is at issue] in the Health Center two times. She found the physical needs of the children to be satisfactory, but each time they were dirty and unkept in appearance, and [the appellant-wife] exhibited no affection for the children so much so that it was noticeable. She was present when Mrs. Janice Jones, also an R.N., called the DHHR on behalf of these children.
As previously noted, Mrs. Sarah Pilcher and Mrs. Bobbye Lafitte both employed by the Sabine Parish Family Services office of the DHHR, testified for the [appellants].
From their investigation they concluded that the [appellants] met DHHR standards. They found no signs of physical neglect of [the two minor children whose custody is at issue]. They found nothing to indicate the children were in imminent danger. They expressed a willingness to work with the `family' to resolve their many problems. They felt the [appellants] were making progress.
The evidence is overwhelming that [appellants] do not provide a proper foster home for the foster children, ... Accordingly, the Court finds [the two minor children whose custody is at issue] to be in need of care and supervision. It will be noted that the Court has not dwelt on [the appellant-wife's] shortcomings. [The appellant-wife] sees no significant wrong in [the appellant-husband], and, considering that [they] live in the same home together, and the fact that [the appellant-husband] is so thoroughly disreputable, and unworthy, the Court did not consider it necessary to elaborate concerning [the appellant-wife]. Suffice it to say that her approval of [the appellant-husband] speaks volumes."
*704 After a careful review of the record, we are convinced that the State proved by overwhelming evidence that appellants neglected the two minor girls, and that they were in need of care and supervision.

DISPOSITIONAL HEARING
The juvenile court has power and authority to assign custody of a child adjudged in need of care or supervision to any person or agency, whether public or private, which it deems will serve the best interest of the child. LSA-C.J.P. Art. 85; State In Interest of Sapia, 397 So.2d 469 (La.1981).
LSA-C.J.P. Art. 2 specifies that if children are removed from the control of their custodians, the juvenile court shall secure for them care as nearly as possible equivalent to that which the legal custodians should have given them.
LSA-C.J.P. Art. 86(A) provides:

"The court should impose the least restrictive disposition which the court finds is consistent with the circumstances of the case, the needs of the child, and the best interest of society. The court shall not remove a child from the custody of his parents unless his welfare or the safety and protection of the public cannot, in the opinion of the court, be adequately safeguarded without such removal." (Emphasis added.)

Appellants contend that in conformity with Art. 86 the juvenile court had at its disposal several alternatives to removal of the children. They stress that if custody of the children were left with them that DHHR representatives were willing to supervise their home.
After a careful review of the record, we cannot say that the juvenile court abused its discretion in removing the two minor girls from appellants' custody and placing the children into the custody of Robert and Marsha Gentry. In less than one year prior to this action three formal complaints were lodged against appellants, and even in light of these inquiries no significant progress was made in the elimination of the elements of neglect and lack of supervision. Furthermore, it was not until after the adjudicatory hearing that appellants contractually agreed with DHHR to correct the adverse conditions proven.
In a corollary issue appellants contend that under LSA-C.J.P. Art. 82 it was erroneous for the juvenile court not to request a predisposition hearing. Art. 82 does not stand for that proposition. LSA-C.J.P. Arts. 78 and 79 make it discretionary on the part of the juvenile court judge to order a predisposition investigation as well as physical and mental evaluations of the child and parents. If these judicial tools are used, Art. 82 provides that the trial judge shall advise the District Attorney and the children's attorney of the contents and conclusions of the reports. There is no provision in the juvenile code which would require a predisposition hearing in addition to the adjudicatory and dispositional hearings. There is no evidence in the record that the juvenile court relied on a predisposition investigation or any other evaluations.
For the foregoing reasons, the judgment of the juvenile court is affirmed.
AFFIRMED.